**ACADIA INSURANCE COMPANY,**
**Plaintiff**

v.

**ALLIED MARINE TRANSPORT LLC**
**and Michael Cranson, Defendants**

**No. CIV. 00–19–P–C.**

United States District Court,
D. Maine.

July 30, 2001.

Leonard W. Langer, Tompkins, Clough, Hirshon & Langer, Portland, ME, for Plaintiff.

Michael Kaplan, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Michael Kaplan, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This is a declaratory judgment action brought pursuant to 28 U.S.C. § 2201 and Rule 57 arising out of a marine insurance contract. In response to Plaintiff's Amended Complaint, Defendants filed a four-count Amended Counterclaim asserting claims for breach of contract, estoppel, bad faith, and negligent salvage and raised affirmative defenses of waiver and estoppel. Prior to trial, the Court granted Plaintiff's

Motion to Dismiss the bad faith count, and Plaintiff's Motion for Partial Summary Judgment on the negligent salvage count. Thereafter, the parties presented evidence over the course of a three-day bench trial. Having considered the evidence and arguments of the parties, the Court makes the following findings of fact and conclusions of law.

## I. FACTS [1]

### A. Acquisition of the Vessel and Insurance

In early October of 1998, Defendant Michael Cranson was exploring the possibility of buying one of three different LCM–6 vessels. On October 8, 1998, Cranson called Frank Butterworth, an insurance agent at C.M. Bowker and Company in Portland, Maine, seeking a quote for navigational coverage for an LCM–6. Plaintiff's Exs. 5A, 6; Tr. at 10, 63, 191–92, 231–32. The purpose underlying the request for a quote was to allow Cranson to determine what his expenses would be in operating a vessel of this type. Tr. at 13. Cranson discussed the general parameters of what he was planning to do with Butterworth. Plaintiff's Exs. 5A, 6; Tr. at 63–66, 193–94, 197–98. Cranson indicated to Butterworth that the vessel would be used for "freight hauling/primarily construction equipment and other freight, to Islands." Plaintiff's Exs. 5A, 6. He further indicated, *inter alia*, that the LCM–6 would be Coast Guard inspected, and would carry a crew

including an operator and one crewmember.[2] *Id.* Seeking quotes for an LCM-type vessel, Butterworth filled in the information on an unsigned application form and forwarded the unsigned application with the above information to a number of different underwriters, including Plaintiff Acadia Insurance Company (hereinafter "Acadia"). Plaintiff's Ex. 5A; Tr. at 197. Butterworth and Cranson subsequently determined that Acadia's quote was the most advantageous. *Id.*

In early November 1998, Cranson purchased the ALLIED RESOURCE, a 56–foot LCM–6, for $27,500. Tr. at 6. The ALLIED RESOURCE was a steel-hulled vessel designed to carry cargo, and was equipped with a ramp located in the bow of the vessel that can be lowered to allow for the loading and unloading of cargo, including vehicles.[3] Plaintiff's Ex. 14. After Cranson acquired the ALLIED RESOURCE, Butterworth filled out another application for marine insurance reflecting the details of the ALLIED RESOURCE. Plaintiff's Ex. 7; Tr. at 233–34. Cranson signed the application and Butterworth sent it to Acadia. Plaintiff's Ex. 7; Tr. at 232–33. The new application was forwarded to Acadia seeking "port risk only" coverage for an LCM–6 owned by Cranson, which was to undergo renovations at PRW Mechanical and Fabricators, Inc. in St. George, New Brunswick, Canada (hereinafter "PRW"). Defendants' Ex. 140 at 68–69; Plaintiff's Ex. 7; Tr. at 312–13.

---

1. At trial, the Court reserved ruling on the admissibility of the testimony of Robert A. Ojala. Defendants proffered his testimony as both an expert and lay witness. Plaintiff objects, as untimely designated, to Ojala's expert testimony and, as irrelevant to the issues in the case, Ojala's lay testimony. The Court agrees with Plaintiff and will, therefore, exclude Ojala's testimony.

2. At that time, Cranson sought hull coverage of $75,000, protection and indemnity coverage of $1,000,000, and cargo legal liability coverage of $100,000.

3. The ramp is equipped with two safety chains, one on the starboard side and one on the port side, which are designed to prevent the forward ramp from opening unexpectedly. The forward ramp door is operated by controls located in the wheelhouse of the vessel.

On December 7, 1998, Matthew Pedersen, the lead marine underwriter at Acadia and the person responsible for quoting coverage on the ALLIED RESOURCE, authorized C.M. Bowker to issue, and C.M. Bowker did issue, an insurance binder providing port risk coverage for the ALLIED RESOURCE.[4] Plaintiff's Ex. 8. Coverage was effective as of November 24, 1998, and carried a hull value of $50,000. *Id.* On December 10, 1998, Butterworth forwarded the port risk policy to Cranson, who received it shortly thereafter. Tr. at 15–16. The policy issued was a time policy with a time period from November 24, 1998, through November 24, 1999. Plaintiff's Exs. 8, 9. The Special Terms and Conditions contained in the port risk policy, included the following:

1. COMMERCIAL USE WARRANTY: Warranted that the insured vessels be used for no commercial purpose other than **PORT RISK ONLY** and coverage shall not be provided for any other activity unless endorsed herein.

. . . . .

3. SEAWORTHINESS WARRANTY: The underwriters shall not be liable for any loss, damage or expense arising out of the failure of the Assured to exercised due diligence to maintain the vessel in a seaworthy condition and in all respects fit, tight, and properly manned, equipped and supplied after attachment of this policy; the foregoing, however, not to be deemed a waiver of any warranty of seaworthiness implied at law.

Plaintiff's Ex. 9. The policy also contained an Inchmaree clause covering, *inter alia,* latent defects in the machinery or hull, and "[n]egligence of master, mariners, engineers or pilots; . . . provided such loss or damage has not resulted from want of due diligence by the insured, the owners or managers of the vessel, or any of them." Plaintiff's Ex. 9, Taylor hull policy, lines 20–34; Tr. at 346–47.

During the period November 1998 through mid-August 1999, the ALLIED RESOURCE underwent substantial renovations at PRW, at a cost exceeding $200,000. Tr. at 33. As part of the renovations, Cranson had PRW install eight "goose-neck" vents, two (one port and one starboard) in each of the four watertight compartments on the ALLIED RESOURCE. Tr. at 45. The vents were 12″ off the work deck of the vessel. Tr. at 391.

In March 1999, Cranson transferred the vessel to Defendant Allied Marine Transport LLC (hereinafter "Allied Marine").[5] Tr. at 4. On April 22, 1999, Cranson filed, on behalf of Allied Marine, an "Application of Initial Issue, Exchange, or Replacement of Certificate of Documentation; Redocumentation," with the National Vessel Documentation Center. Plaintiff's Ex. 2; Tr. at 7. The application sought an endorsement for coastwise trade only, and indicates that the primary service of the vessel is as a "freight barge." Plaintiff's Ex. 2. In completing the Application for Documentation, Cranson certified that the vessel "will not be operated in a trade not authorized by the endorsement(s) on the certificates(s) of documentation." Plaintiff's Ex. 2. On April 28, 1999, the National Vessel Documentation Center issued a Certificate of Documentation for the ALLIED RESOURCE, assigning official number 1080422. Plaintiff's Ex. 3. The only operational endorsement for the vessel was "coastwise." *Id.*

---

4. The parties do not contest that for purposes of this marine insurance contract, C.M Bowker and Butterworth are agents of Acadia.

5. Cranson is the owner and operator of Allied Marine Transport LLC. Tr. at 4.

## B. Lifting the Port Risk Restriction

In early August 1999, Cranson contacted C.M. Bowker to notify the agency that the ALLIED RESOURCE was almost ready to launch and to request navigational coverage. Tr. at 21, 69, 211–12, 242; Defendants' Exs. 53, 55. Cranson further requested hull coverage of $250,000, protection and indemnity coverage of $1,000,000 with one paid crew, and cargo legal liability coverage of $100,000. Plaintiff's Ex. 15. Once the vessel arrived back in Maine, it was to be used for "hauling cargo." Plaintiff's Ex. 15. It was to carry a crew of two, including the master. Plaintiff's Ex. 13. Butterworth contacted Acadia to convey the need to create an amendatory endorsement and advise as to the change in coverage. Tr. at 248, 251–52; Defendants' Ex. 56. Acadia replied through C.M. Bowker that the vessel would have to be surveyed for condition and value and that the results of the survey would need to be satisfactory to Acadia before the vessel would be allowed to navigate under the coverage. Tr. at 23, 69–73, 215–16, 320, 352. Butterworth faxed to Cranson a list of surveyors, which included the name of Bernard Cheney, whom Acadia had informed Butterworth was a surveyor acceptable to Acadia. Tr. at 71, 241; Defendants' Ex. 95. Butterworth requested that Acadia provide a quote on the amended coverage. The quote provided by Acadia in August 1999 was conditioned on a satisfactory survey of the vessel.

Allied Marine and Cranson retained the services of Captain Bernard Cheney of Machias, Maine, to survey the ALLIED RESOURCE. Tr. at 23. Cheney surveyed the vessel and prepared a written survey dated August 11, 1999. Plaintiff's Ex. 14. The information contained in the survey came either from Cranson or from Cheney's observations and inspection of the vessel. *Id.* The written survey confirmed the information previously provided to Acadia or C.M. Bowker by Cranson, including that two individuals would man the vessel—Cranson as master and one paid crewmember. *Id.* Cheney's survey said that the vessel would be used as "marine transport—work boat." *Id.* Cheney valued the vessel at $250,000. Plaintiff's Ex. 14. Cheney's survey made only one recommendation: "install door seals prior to putting to sea. They have been inspected and will make excellent seals." *Id.* at 3. Because Cheney was unable to complete his written survey on time, he reported verbally to Pedersen, who accepted the results of his survey and authorized Butterworth to inform Cranson that navigational coverage had been extended to the vessel.[6] Tr. at 320–21; 342.

An amendment reflecting the above changes was prepared by Acadia on August 23, 1999. Tr. at 322–24; 336; Plaintiff's Ex. 13, Amendatory Endorsement. The changes would not constitute a new policy but, rather, would amend the existing policy. Tr. at 343. Shortly thereafter, Acadia issued an invoice in the amount of $755 for the increased premium due to the changes in the policy. Tr. at 249. The invoice was forwarded directly to Allied Marine Transport LLC, which paid the invoice in September 1999. Prior to paying the invoice, Cranson called Butterworth, who explained that the additional premium was for the requested amendments to Acadia's policy. For reasons that no witness could explain, the amendatory

---

6. After receiving Cheney's survey from Butterworth, Pedersen examined it in order to determine whether the vessel had adequate value and whether there were any unseaworthy conditions that would preclude coverage. Tr. at 248, 339–42. Pederson found none. *Id.*

endorsement was not received at C.M. Bowker until November 5, 1999, and was not received by Cranson and Allied Marine until November 15, 1999.[7] Tr. at 78–81, 253

On or about August 13, 1999, the ALLIED RESOURCE departed New Brunswick, arriving in Rockland, Maine, approximately one and one-half days later. Throughout the trip, the vessel carried a crew of two; Cranson served as master and Charles Weidman served as crew. Although Cranson had complied with Cheney's recommendation that the two side ramp seals be permanently installed, he did not permanently install the bottom ramp seal. Rather, the bottom ramp seal was simply laid in place before the ramp door was closed.

### C. Cranson's Communications to Acadia Concerning Vessel Use

By the end of August 1999, Cranson learned that he needed a certificate of inspection from the United States Coast Guard in order to haul cargo for hire in Penobscot Bay. Tr. at 66–68, 83. Cranson and Allied Marine chose not to seek a Certificate of Inspection for the ALLIED RESOURCE, and, therefore, were not able to carry cargo for hire. Tr. at 28. Cranson called Butterworth and told him that the vessel needed a Certificate of Inspection and did not have one. Tr. at 31–32, 68. Cranson requested that Butterworth, therefore, cancel the crew coverage, informing him that the vessel had not and would not have such exposure. Tr. at 268–69; Defendants' Ex. 57. Cranson further informed Butterworth that he would be chartering the vessel for mooring inspections, but that he would continue to serve as captain. Defendants' Exs. 57 and 140 at 52; Tr. at 266–68, 281; 247. Cranson's purpose in informing Butterworth of a charter to a mooring inspector was to make sure that he had insurance coverage for such activities. Tr. at 84, 514.

Butterworth understood that Cranson was using the ALLIED RESOURCE to inspect moorings. Tr. at 300. Butterworth did not think the mooring work was outside the scope of the commercial use warranty. Tr. at 281. Butterworth wanted to notify Pedersen of the change in the use of the vessel, so he faxed a message to Acadia, informing it of Cranson's communication that he was chartering to a mooring inspector but was still "captaining his vessel."[8] Tr. at 267–69; Defendants' Exs. 57 and 140 at 52. The fax clearly request-

7. C.M. Bowker maintains a tickle file system to insure that reminder notices go out to Acadia if amendments and other documents are not issued in a timely manner. Tr. at 249–50. Butterworth was forced to send Acadia reminder notices on two occasions, in September 1999 and October 1999, to cause the amendatory endorsement for the issuance of navigation coverage to issue. Tr. at 248–50.

8. Cranson also testified that he called Butterworth and asked him whether Charles Weidman could take the vessel to attempt to retrieve anchors from the ocean near Matinicus Island. Tr. at 513. Cranson testified that his purpose in making this request was to confirm that he would have insurance coverage. *Id.* Cranson further testified that Butterworth

replied that it was within the scope of his coverage. *Id.* Butterworth testified that he did not recall any such conversation with Cranson. Tr. at 279, 282. Although he kept detailed notes of conversations he had with Cranson, Butterworth's file contains no notes reflecting that such a conversation ever occurred. Aside from Cranson's testimony, the record contains no evidence that anyone at C.M. Bowker or Acadia had told Cranson that he had insurance coverage for Weidman to take the ALLIED RESOURCE to Matinicus Island to recover anchors. The Court finds that Cranson was never given permission to allow Weidman to take the ALLIED RESOURCE to dive for anchors off Matinicus Island.

ed that Pederson call Butterworth. *Id* Pedersen testified that he would not have permitted the vessel to be employed for charter and he "believe[d]" he called Butterworth, as requested, and told him so. Tr. at 325–27. The Court does not credit Pedersen's testimony on this point.[9] Butterworth testified that he did not hear back from Pederson that the new use was a problem under the policy; therefore, Butterworth never notified Cranson that the use of the vessel was impermissible under the policy. Tr. at 84, 277, 514. Butterworth testified that he did not believe that the use of the vessel for mooring inspection was outside of the vessel's coverage. Tr. at 281.

In September 1999, Cranson put the vessel up for sale in a national publication. Tr. at 33, 84–85. From the time the ALLIED RESOURCE returned to Maine in August 1999, until the time it sank on October 24, 1999, it was used commercially on only three occasions, twice to inspect moorings and once as a support vessel. Tr. at 29. During this time, the ALLIED RESOURCE never carried cargo for hire. Tr. at 28.

### D. The Loss

During the morning of October 24, 1999, Weidman called Cranson and asked Cranson to accompany him on a trip on the ALLIED RESOURCE to an area around Mark Island in Penobscot Bay, Maine. Tr. at 36. At the time of the loss, Weidman was an employee of Rockland Boat

Company, a retail marine supply store in Rockland, Maine. Tr. at 110. Weidman had been employed at Rockland Boat for four years prior to the loss. Tr. at 111. He had received a degree in geography and philosophy from the University of Miami in 1989, and worked primarily as a massage therapist from the time he graduated from college until 1995, when he moved to Maine. Tr. at 113. In October 1999, Weidman was a recently certified dive instructor. Tr. at 111. Although Weidman did not hold any Coast Guard licenses and did not own any vessels, he had some general experience in various maritime-related matters including general small boat handling. Tr. at 114–18, 162–63. Weidman helped to rebuild the ALLIED TRANSPORT, working on virtually every system on the vessel. Tr. at 87–88. Weidman conned the vessel for approximately one-half of the approximately fifteen-hour trip from New Brunswick to Rockland. Tr. at 76, 86, 165. Other than the ALLIED RESOURCE, Weidman did not have any experience operating an LCM–6. Tr. at 117.

The purpose of Weidman's trip was to go to Mark Island to explore potential scuba diving sites. Tr. at 129. Cranson indicated that he could not go on the trip, but offered to allow Weidman to take the vessel by himself to Mark Island, approximately five or six miles from Rockland Harbor. Tr. at 129, 135. Cranson knew

---

**9.** Pedersen proffered a document, Plaintiff's Ex. 27, that had a check mark by the language interpreted as a request to insure a 16' skiff (indicating he approved) and an "x" by the language concerning chartering to a mooring inspector (indicating he declined), and it also bore C.M. Bowker's "second request" 10/14/99 stamp. The copy of the same document in Acadia's underwriting file, however, shows neither an "x" nor a check mark. Defendants' Ex. 140 at 52. The copy of the same document in Butterworth's files shows

the check mark and the "second request 10/14/99" stamp, but not the "x." Defendants' Ex. 57. Thus, the check mark appears to have been placed on the document at some point after 10/14/99. The "x" was placed on the document at some later time, suggesting that Pedersen's explanation, which implied that he marked the document prior to calling Butterworth back, was not accurate. Butterworth said he did not know whether Pedersen had called or not. Tr. at 268.

that Weidman would be operating the vessel by himself that day, but he did not provide Weidman with any instructions prior to his departure other than to "be careful." Tr. at 43. When the ALLIED RESOURCE left its mooring on the morning of October 24, 1999, it carried Weidman as a crew of one. The weather was good, with light winds out of the west and calm seas. Tr. at 134–36. Weidman checked over the vessel, released it from its mooring, and traveled to Mark Island with the preventer chains still attached. Tr. at 137. Once Weidman cleared the harbor, he increased the vessel's speed to approximately ten knots, the vessel's standard cruising speed. Tr. at 135. The trip to Mark Island was uneventful. When he reached the north end of Mark Island, Weidman anchored the vessel and lowered the forward ramp to a point where the tip of the ramp was in the water to facilitate Weidman's exit from and entry onto the vessel. Tr. at 138–39. During the next three hours, Weidman completed a number of dives from the ALLIED RESOURCE. *Id.*

After completing his last dive, Weidman returned onboard the vessel and raised the anchor. Tr. at 140–41. Finding excessive amounts of mud on the anchor, Weidman lowered the anchor approximately seven feet over the front of the bow ramp. Tr. at 142. In order to wash the mud off the anchor, he traveled down the east side of Mark Island, heading south, with the anchor and chain still running approximately seven feet over the front of the bow ramp. Tr. at 140–42, 143, 173. After approxi-

mately three to five minutes, the anchor was clear of the mud, and Weidman went down onto the work deck and raised the anchor. Tr. at 143. Then he returned to the wheelhouse of the vessel and raised the bow ramp. *Id.* Weidman did not return to the work deck to secure the safety chains, and he did not check to ensure that the bottom ramp seal was properly placed.[10] Tr. at 143–44, 174, 187. At that time, the watertight door leading to the engine room was open.

By that time he was approaching the southern tip of Mark Island. Tr. at 145. Because he wanted to go back to the northern end of the island, he turned and proceeded up the west side of Mark Island. Tr. at 145. After raising the bow ramp, Weidman proceeded northwest along the west side of Mark Island at around ten knots. Tr. at 146. At some point after reaching cruising speed, Weidman left the wheel.[11] Tr. at 146–48, 170–71. While cleaning up some equipment in the rear of the wheelhouse, he heard a bang, which he believed was a lobster pot being cut by the vessel's propeller shaft. Tr. at 148. Weidman looked aft. Tr. at 149–151. When Weidman failed to see a lobster pot break the surface of the water, he turned around after a short delay and returned to the wheel in the front of the wheelhouse. *Id.* At that point, he saw water coming in over the work deck of the vessel. *Id.* The bow ramp was nowhere to be seen. Tr. at 153. At the time Weidman returned to the wheel, the vessel was moving at approximately ten knots. *Id.* Weidman, in an attempt to stem the flow of

---

10. If the bottom ramp seal is not properly seated, water was able to enter the work deck of the vessel.

11. During this time, no one was at the wheel of the vessel and no lookout was being maintained. There was no automatic pilot on the ALLIED RESOURCE. Although Weidman could not see either the water or the rest of the vessel from his position in the rear of the wheelhouse, and specifically could not see the bow ramp, he attempted to determine that the vessel was still on course by watching the tops of the trees on Mark Island pass by the wheelhouse window.

water onto the work deck, briefly placed the vessel's engine in reverse. *Id.* Believing that such maneuver was not doing any good, Weidman placed the throttles in the full-ahead position in a futile attempt to reach Mark Island, approximately one-quarter mile off the starboard beam. Tr. at 154–57. The total time from when Weidman heard the bang to the time he was in the water was less than two minutes. Tr. at 157. The ALLIED RESOURCE quickly sank in over 200 feet of water. Tr. at 373. Shortly thereafter, a passing motorboat picked up Weidman.

### E. The Investigation by Acadia

Acadia was notified of the loss on October 25, 1999. Tr. at 363. Acadia sent Wil Gagnon both to investigate and attempt salvage. Tr. at 363–64, 410. Acadia hoped to salvage the ALLIED RESOURCE to determine not only the cause of the loss, but also the extent of the damage. Within two days after the loss, Gagnon met with Cranson and Weidman. Tr. at 363–64. Gagnon made it clear to Cranson that his presence, and Acadia's efforts to salvage the vessel, were not an indication that there was coverage for the loss. Tr. at 366. That day, Cranson arranged for a vessel to take Gagnon to search for the position of the vessel. Tr. at 362, 412. They had to return the next day on another boat with a better sonar device, and in calmer weather, in order to get a definite fix. Tr. at 180–81, 421. Weidman arranged for a video camera to confirm the location of the vessel. Tr. at 180. Within a short period of time after locating the ALLIED RESOURCE, Gagnon contacted several possible salvage firms and made arrangements with a commercial diving company to undertake the salvage of the vessel. Tr. at 371–72. Due

to the depth of the water, arrangements were made to procure a decompression chamber and have it shipped to Rockland. Tr. at 373. Acadia covered all of the costs associated with retaining the salvage company, the commercial divers, and procuring the decompression chamber.[12] Tr. at 374.

Notwithstanding the plans to salvage the vessel, the weather did not cooperate. Tr. at 375. After approximately three weeks of waiting for the weather to cooperate, Acadia's focus changed from salvage to the question of coverage. Tr. at 374–76. In mid-November 1999, Steve Rich, Acadia's Assistant Vice President for Claims; Claire Mullaney, Acadia's Claim Manager; and Gagnon met to discuss the status of the claim. Tr. at 375, 421; Defendants' Ex. 37. At the meeting questions were raised as to whether there was any coverage for the loss of the ALLIED RESOURCE. Tr. at 375. On November 18, 1999, Acadia forwarded a reservation of rights letter to Cranson and Allied Marine in which Acadia notified Cranson and Allied Marine that Acadia had concerns regarding the seaworthiness of the ALLIED RESOURCE, the crew on board at the time of the loss, and the use of the vessel at the time of the loss. Tr. at 375, 377; Plaintiff's Ex. 25. Acadia further requested that Cranson provide a statement under oath as part of Acadia's investigation into the loss of the vessel. Tr. at 377. Cranson provided a statement under oath, as requested, on December 2, 1999. Tr. at 382.

On December 27, 1999, Acadia declined coverage for the loss of the ALLIED RESOURCE on the grounds, *inter alia*, that the vessel was being operated in violation of the warranty of use; that Cranson had

---

**12.** Those costs, plus the costs associated with locating the ALLIED RESOURCE, totaled approximately $13,000. Tr. at 374.

failed to use due diligence in allowing the vessel to go to sea on October 24, 1999, with only Weidman on board; that Cranson had failed to properly instruct Weidman as to the proper operation of the vessel; and that on the day of the loss, the vessel was unseaworthy not only due to an inadequate number of crew, but also due to an unqualified crew. Tr. at 378–79; Plaintiff's Ex. 26. At trial, Acadia conceded that the vessel is a total loss and that the vessel was insured for $250,000. Tr. at 496.

## II. ANALYSIS

▮ The procedure for determining what law applies to a marine insurance contract is controlled by *Wilburn Boat Co. v. Fireman's Fund Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). In *Wilburn Boat,* the Supreme Court held that the regulation of marine insurance should be left to the states. *Id.* at 321, 75 S.Ct. at 374. Under *Wilburn Boat,* insurance questions in the admiralty field are to be decided on the basis of state law unless there exists a "judicially established federal admiralty rule governing" the question. *Id.* at 314, 75 S.Ct. at 370; *Kossick v. United Fruit Co.*, 365 U.S. 731, 742, 81 S.Ct. 886, 894, 6 L.Ed.2d 56 (1961) ("The application of state law in [*Wilburn Boat* ] was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented."); *Windsor Mount Joy Mutual Insurance Co. v. Giragosian,* 57 F.3d 50, 54 (1st Cir.1995). Acadia has invoked three applicable rules of federal maritime law: (1) the doctrine of seaworthiness, (2) the law of express warranty, and (3) the principle of *uberrimae fidei.*

### A. SEAWORTHINESS

Plaintiff asserts that the ALLIED RESOURCE sank as a result of one or more of the following unseaworthy conditions: (1) an inadequate crew, both in number and competency; (2) inadequate equipment; and/or (3) an unseaworthy condition, which must be inferred from the very fact of the sinking in calm weather without an adequate explanation from Defendants. Defendants deny that the vessel was unseaworthy. In the alternative, Defendants respond that, to prove breach of warranty, the plain language of the express seaworthiness warranty indicates that two sets of facts must be demonstrated by Acadia in addition to an unseaworthy condition. First, the unseaworthy condition must result from a lack of due diligence of the insured to maintain the vessel in a seaworthy condition. Second, the loss must arise out of the failure of the insured to exercise such due diligence. In other words, Acadia cannot avoid liability, Defendants assert, unless it establishes that the unseaworthy condition was proximately caused by the insured's lack of due diligence.[13]

▮ The parties' contract of insurance in effect at the time of the sinking of the ALLIED RESOURCE included an express warranty of seaworthiness. The express warranty in this marine insurance policy provides:

> The underwriters shall not be liable for any loss, damage or expense arising out of the failure of the Assured to exercised due diligence to maintain the vessel in a seaworthy condition and in all respects fit, tight, and properly manned, equipped and supplied after attachment of this policy; the foregoing, however,

---

**13.** Both parties' briefs discuss the implied warranty of seaworthiness. The Court will not analyze the implied warranty separately because the terms of the express warranty are consistent with the implied warranty of seaworthiness applicable in this case.

not to be deemed a waiver of any warranty of seaworthiness implied at law. Plaintiff's Ex. 9.[14] The violation of an express warranty will void a policy in its entirety. *See Aguirre v. Citizens Casualty Co.*, 441 F.2d 141, 143 (5th Cir.1971); *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir.1957); *see generally* 2 THOMAS J. SCHOENBAUM, ADMIRALITY AND MARITIME LAW § 19–8 (3d ed.2001). Under the seaworthiness warranty in the instant policy, Defendants correctly assert that Acadia must establish that the unseaworthy condition must be caused by a lack of due diligence on the part of the assured and that the unseaworthy condition is the cause of the loss.

■ Seaworthiness is not an absolute standard. The warranty of seaworthiness means that the vessel is reasonably fit for its intended use. As one commentator put it:

Seaworthiness is a comprehensive term, and a relative one. The requirement is that the vessel not only be staunch and strong, but also that she be fitted out with all proper equipment in good order, and with a sufficient and competent crew and compliment of officers. But these requirements are relative to the voyage or service proposed. A ship that is in one or another of these respects unseaworthy for an Atlantic crossing in December may nevertheless be seaworthy for a coasting run to the south in the same season.

GILMORE & BLACK, THE LAW OF ADMIRALTY at 65 (2d ed.1975).

### 1. Adequately Manned

■■ The concept of seaworthiness extends not only to the vessel and its gear, but also to its crew. *See Waldron v.*

Moore–McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955). Both the policy and the case law require this vessel to be "properly manned." Plaintiff's Ex. 7; *see also Waldron*, 386 U.S. at 728, 87 S.Ct. 1410 (an inadequate crew renders a vessel unseaworthy); 1 SCHOENBAUM, ADMIRALITY AND MARITIME LAW §§ 6–26. There are two aspects to a vessel being properly manned: the crew must be adequate in number and must be competent. It is clearly the duty of a ship owner to not only provide a crew sufficient in number, *see, e.g., June T., Inc. v. King*, 290 F.2d 404 (5th Cir.1961), but also a crew competent for the duties it may be called upon to perform, including provision for any exigency which is likely to be encountered. *See, e.g., Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204, 210 (5th Cir.1968); *Admiral Towing v. Woolen*, 290 F.2d 641, 646 (9th Cir.1961).

■ Plaintiff contends that the ALLIED RESOURCE was unseaworthy when it left Rockland Harbor on October 24, 1999, because it carried only one crewmember and that crewmember was incompetent. With respect to Weidman's skill and competence, Acadia points to a number of pieces of evidence that, it argues, establish that Weidman was incompetent, including Weidman's failure to attach the preventer chains on the ramp door once it had been raised and the ALLIED RESOURCE was steaming at ten knots up the western side of Mark Island, his failure to close the watertight door leading into the engine space, his failure to keep a proper lookout, and his handling of the ALLIED RESOURCE once the bow ramp

---

**14.** The seaworthiness warranty provision did not change from the initial port risk policy to the amended policy.

door disappeared and the vessel was taking on water.

At trial, Acadia presented the testimony of Captain Norman Wahl, a certified marine surveyor with over thirty-one years experience. During that time, he has surveyed thousands of vessels, including commercial vessels. Over the course of his professional career, he spent close to five years with the United States Navy, during which time he had extensive experience with front-loading cargo carrying vessels, including LSTs, LCVPs, and LCMs. Following his military service, Wahl worked in boat yards and on various commercial vessels. He also took courses in naval architecture, including stability and design. At the time of trial, Wahl held various Coast Guard licenses, including Master of Steam or Motor Vessels, any gross tons, with a first class pilot endorsement for steam and motor vessels covering fourteen separate pilotage areas. Such licenses would authorize Wahl to operate the ALLIED RESOURCE. Wahl has sailed as Master on over thirty commercial vessels and has piloted between fifty and sixty different vessels. Several of the vessels that Wahl has piloted, and on which he has acted as master, are equipped with bow ramps similar in use to the bow ramp on the ALLIED RESOURCE.

Both Gagnon and Wahl asserted that the vessel was not adequately manned because it carried only one person. Tr. at 387, 392, 394–95, 454, 468. There was no evidence presented at trial as to why a vessel of this type and/or size must be manned by more than one person. The Court infers from the testimony of Wahl, however, that had it had a crew of two, it is more likely than not that one of the crewmembers would have been on the work deck at the time the bow ramp was closed and would have secured the safety chains. Nevertheless, the underwriting file contained notice to Acadia that the vessel might be operating without a crewmember (*i.e.*, master only). Tr. at 432, Defendants' Ex. 140 at 52. In addition, early in the underwriting process Butterworth had given Cranson quotes of the cost of insurance coverage with, and without, crew. Tr. at 254–55; Defendants' Ex. 63. Acadia removed the coverage for a crewman on the ALLIED RESOURCE and, as such, had knowledge that a single individual might operate the vessel. Indeed, Mullaney acknowledged that the mere fact that only one person manned the vessel would not, in and of itself, void coverage. Tr. at 504–09. On this record, the Court finds that given that the purpose for which the vessel was being employed on October 24, 1999, (simply to survey the area of Mark Island for an adequate dive site to complete the certification of students in a scuba diving course) the fact that she was being operated with a crew of only one did not, in and of itself, create an unseaworthy condition.

Although the solo operation of the ALLIED RESOURCE by a competent seaman would not make the vessel unseaworthy, Weidman's solo operation of the vessel did make the vessel unseaworthy because he lacked sufficient experience. Both Gagnon and Wahl asserted that the vessel was not properly manned because Weidman was an incompetent seaman. Tr. at 387, 392, 395, 454, 468. Wahl and Gagnon both concluded that Weidman was incompetent to operate the ALLIED RESOURCE alone. In addition to his lack of experience in handling a vessel of this type and size, both witnesses cited the following to support their conclusion regarding Weidman's incompetence: Weidman's failure to attach the preventer chains on the ramp door once it had been raised, his failure to close the watertight door leading into the engine space, his failure to keep a proper lookout, and his handling of the ALLIED

RESOURCE once the bow ramp door disappeared and the vessel was taking on water.

The Court agrees with Acadia that Weidman was incompetent to singly operate the ALLIED RESOURCE on October 24, 1999. After graduating from college, Weidman had worked as a massage therapist and, since moving to Maine, he was employed at a marine supply store. Weidman had no formal training in ship handling or seamanship and did not hold any Coast Guard licenses. Although Weidman had spent much of his life around boats, he had very little experience operating a vessel of the size of the ALLIED RESOURCE. Tr. at 114–16, 162–63. Weidman's experience with a vessel of this size consisted of the single occasion when he operated the ALLIED RESOURCE for approximately one-half of the approximately fifteen-hour trip from New Brunswick to Rockland. Tr. at 76, 86, 165. During that time, the vessel was underway and at sea. It is significant that, during the trip from New Brunswick, Weidman was never alone on the ALLIED RESOURCE and thus attained no acquaintance with the solo operation of the vessel. Although Weidman may have gained experience navigating the vessel, he did not gain any experience operating the deck equipment, including the ramp door. Aside from the limited time Weidman operated the ALLIED RESOURCE, he had no experience operating an LCM-6.

The evidence of Weidman's lack of experience in seamanship on a vessel of this size is particularly striking to the Court. Although he grew up around boats, Weidman clearly did not have the knowledge and experience necessary to handle a vessel of this type or size alone. Weidman's lack of experience is demonstrated by his conduct throughout the course of events leading up to the loss. For example, he was operating the vessel with the engine room door open, the bow ramp preventer chains off, and no lookout while underway at cruising speed. In addition, once the vessel started to take on water, Weidman's decision to place the engines in the full-ahead position after only a short period in reverse was contrary to an understanding of ship handling and good seamanship practices. Tr. at 464–65.

Acadia argues that it was Cranson's lack of due diligence in allowing the vessel to leave Rockland with an incompetent crew that caused the loss. Defendants respond that the evidence establishes that Cranson did instruct Weidman on how to operate the vessel and equipment, and further, that Weidman understood the instruction and was aware of his duties. Therefore, Defendants assert, there was no lack of due diligence on Cranson's part. The evidence reveals that Cranson verbally instructed Weidman on the operation of the vessel, the operation of the vessel's machinery, and various aspects of seamanship including watch keeping, rules of the road, and other matters. Tr. at 87–89, 96, 167, 173, 175–76, 511–12. As a result of Weidman's training by Cranson, Weidman understood that the vessel was never to be operated without the preventer chains on the open sea or while traveling at anything but idle speed in a safe harbor. Tr. at 85–89, 175–76, 512.

Despite Cranson's instructions, the ALLIED RESOURCE was in an unseaworthy condition when Weidman, alone, was operating it, and such unseaworthiness proximately resulted from Cranson's lack of due diligence to assure the vessel was manned by a competent crew. Although Cranson provided rudimentary instruction to Weidman regarding operation of the systems on the ALLIED RESOURCE, he did not provide instruction in seamanship, ship handling, and the rules of the road

adequate to render Weidman qualified to operate the ALLIED RESOURCE on October 24, 1999. Cranson and Weidman had known each other for some time before the loss of the ALLIED RESOURCE. There was no evidence introduced at trial indicating that Weidman had been dishonest with Cranson in relating his experience on vessels. There was no evidence that Weidman had told Cranson that he had operated a vessel of this size previously or that Weidman had otherwise indicated that he was sufficiently trained in seamanship or ship handling to make him qualified to captain the ALLIED RESOURCE. The Court finds that Cranson was aware of Weidman's limited experience handling a vessel of this type and size. Given Weidman's lack of experience, Cranson's decision to allow Weidman to take the vessel on October 24, 1999, constituted a failure to use due diligence to provide the ALLIED RESOURCE with a competent crew. Ten hours of navigation at sea is not sufficient instruction on the operation of the door ramp or general ship handling for a specialized vessel like the ALLIED RESOURCE.

■ The Court further finds the fact that the ALLIED RESOURCE was not properly manned was a proximate cause of the loss of the vessel on October 24, 1999. Specifically, the Court concludes that three factors caused the sinking and that those factors arose directly from the incompetence of Weidman: (1) the failure to attach the preventer chains, (2) Weidman's handling of the vessel after it started to take on water, and (3) the operation of the vessel with the watertight engine room door open. The failure to attach the preventer chains allowed the ramp door to open and the vessel to take water on the work deck. In addition, Weidman's decision to place the engines in the full-ahead position after only a short period in re-

verse was contrary to good seamanship practices, was evidence of his insufficient competence. Finally, the ALLIED RESOURCE is equipped with a watertight door leading from the vessels engine room to the work deck. Although it is customary to operate the vessel with the door closed, Weidman failed to do so when he left Mark Island. At the time the bow ramp let go, the engine room door was open, allowing water to down-flood into the engine room once it surpassed the nine-inch threshold. Tr. at 150. The presence of water in the engine room would have caused the engines to fail and, thus, seal the fate of the ALLIED RESOURCE. The incompetence of Weidman, therefore, proximately caused of the loss of the ALLIED RESOURCE.

■ Defendants argue that, notwithstanding the fault on the part of Weidman, the loss of the vessel is nonetheless covered by the "Inchmaree" clause. Coverage is extended under the Inchmaree clause, Defendants assert, for damage caused by the negligence of the vessel's master or crew and latent defects that might otherwise be considered unseaworthy conditions. Plaintiff responds that the Inchmaree clause in this case does not cover negligence of the owner, as contrasted with the negligence of the master or crew. *See Thanh Long Partnership v. Highlands Ins. Co.*, 32 F.3d 189, 193 (5th Cir.1994); *Goodman v. Fireman's Fund Ins. Co.*, 452 F.Supp. 8, 10–11 (D.Md.1977).

The Inchmaree clause provides, in relevant part, coverage for latent defects in the machinery or hull and "negligence of master, mariners, engineers or pilots; ... provided such loss or damage has not resulted from want of due diligence by the insured, the owners or managers of the vessel, or any of them." Plaintiff's Ex. 9, Taylor hull policy, lines 20–34; Tr. at 346–47. In other words, for those risks cov-

ered by the Inchmaree clause, the warranties of seaworthiness do not apply. *See Continental Ins. Co. v. Hersent Offshore Inc.,* 567 F.2d 533 (2nd Cir.1977) (imprudent actions, negligence, and poor judgment by the superintendent in command of the barge are no bar to recovery since covered by the Inchmaree clause). Nevertheless, the Court has already found that Cranson's lack of due diligence in providing a competent crew resulted in an unseaworthy condition. The Inchmaree clause specifically excludes coverage for "loss or damage ... result[ing] from want of due diligence by the insured [or] the owner[]... of the vessel." Plaintiff's Ex. 9, Taylor hull policy, lines 32–33. Therefore, the Inchmaree clause cannot provide coverage for Defendant.

Defendants also argue that the latent defect provision in the Inchmaree clause is applicable. Plaintiff responds, asserting that Defendants bear the burden of showing that a particular loss was from a covered loss. *See Northwestern Mutual Life Ins. Co. v. Linard,* 498 F.2d 556, 561 (2nd Cir.1974). The Court agrees. Although there is no question that the vessel sank due to incursion of seawater, Defendants have not offered any proof as to what caused the forward ramp to open. Weidman and Cranson both testified that they did not know what happened to the ramp. Therefore, the latent defect portion of the Inchmaree clause extending coverage for the loss is not applicable.

## 2. Equipment

■ Plaintiff also argues that the vessel's unseaworthy state occurred as a result of the defects in the ramp seals and vents which rendered the vessel unseaworthy for purposes of the warranty. The fact that these defects were pointed out in a survey, Acadia asserts, is irrelevant. Under the express terms of the policy, Defendants were required to exercise due

diligence to render the vessel seaworthy, and the failure to do so exonerates Acadia from liability for any resulting loss. In other words, the failure to repair a known defect rests solely upon the vessel's owners. *See Employers Insurance Co. of Wausau v. Occidental Petroleum Corp.,* 978 F.2d 1422 (5th Cir.1992).

### a. Ramp door seals

Plaintiff asserts that one reason it declined coverage is that Cranson failed to properly install and maintain the ramp door seals, thereby rendering the vessel unseaworthy. Defendants' Ex. 26. Defendants respond that the fact that the ramp door seals were not glued in was known to Acadia through Cheney's survey. Tr. at 425. Although the survey recommended that the door seals immediately be installed, Cranson decided not to permanently affix the door seals on the bottom because of his concern that traffic passing over the door seals would tear up the door seals. Tr. at 90–91. Defendant asserts that where a condition alleged to be a breach of warranty is known to Acadia prior to issuing coverage, that condition does not breach the warranty or void the policy unless the company requires that the condition be rectified and the owner fails to do so. Acadia's notice of the fact that the ramp door seals were not affixed at the time of the survey and Cheney's recommendation that they be permanently installed, Defendants assert, should be regarded as a waiver or estoppel where the insurer fails to require rectification as a condition of coverage. Acadia responds that its receipt of the survey does not constitute a waiver of the express warranty of seaworthiness.

The evidence established that Acadia failed to require Cranson to permanently install the door seals as a condition of coverage. In this case, Acadia failed to

follow its purported practice of requiring compliance with surveyor's recommendations prior to issuing coverage when it was aware of an unseaworthy condition. Acadia did, however, through its agent and marine surveyor, Cheney, request that Defendant permanently affix the ramp door seal and was told by Cranson that it would be done prior to putting to sea. *See* Plaintiff's Ex. 14 at 3: The Court agrees that where an insurer notes that some change be made and the owner expressly agrees to make such change, the failure of the insurer to make the installation a condition of coverage does not waive a claim for unseaworthiness with respect to such condition.

Wahl testified that the failure to permanently affix the ramp door seals rendered the vessel unseaworthy. Tr. 459. Pedersen was aware that, as of the survey, the door seals of the ALLIED RESOURCE were not glued in, and he thought they reflected an unseaworthy condition. Tr. at 340. Although Cranson clearly had a reasonable explanation for not permanently installing the seals, his concern for preserving the ability for the door to seal does not overcome the patently unseaworthy condition that existed without the seals permanently attached. However, there is no evidence that this condition caused the loss, as is required under the terms of the express warranty of seaworthiness. The experts conceded that they uncovered no evidence that the ramp door seals contributed in any way to the loss. Indeed, the evidence indicated that the ramp door seals were not the cause of the loss. The evidence revealed that when the seal is not properly seated, the forward motion of the vessel causes water to come through the bottom of the ramp door. Weidman testified that he had the opportunity to observe the bottom of the ramp door after he closed it, that he saw no water entering prior to his leaving the helm, and that the

vessel was at cruising speed. Accordingly, although the failure to permanently affix the ramp door seals created an unseaworthy condition, such condition did not cause or contribute to the loss.

### b. Gooseneck vents

During the renovations, Cranson had PRW install eight gooseneck vents, two (one port and one starboard) in each of the four watertight compartments on the ALLIED RESOURCE. The vents were twelve inches off the work deck of the vessel. Therefore, if more than twelve inches of water was present on the work deck of the vessel, water would down-flood through the vents into the otherwise watertight compartments. Plaintiff contends that the height of the gooseneck vents off the deck constituted an unseaworthy condition. Defendants deny that the height of the vents made the vessel unseaworthy. Even if the vent height made the vessel unseaworthy, Defendants argue, Acadia's failure to note the condition or require any change before insuring the vessel waived any objection to the condition.

Cheney did not find the gooseneck vents to constitute an unseaworthy condition when he surveyed the vessel. Plaintiff's Ex. 14. Cheney's survey was accompanied by a number of photographs, at least two of which clearly show gooseneck vents of approximately one foot in height into the watertight compartments. Plaintiff's Ex. 14, photographs, see Tr. at 425–27. Pedersen examined Cheney's photographs and did not see anything in any of the photographs that caused him to require that anything be rectified as a condition of coverage. Tr. at 342. The gooseneck vents were not deemed to be unseaworthy by two experts. The Court does not conclude, however, that Acadia waives any claim to unseaworthiness simply because the condition existed at the time the sur-

vey was conducted, and Acadia never made raising the height, or elimination altogether, of the gooseneck vents a condition of coverage despite its knowledge of their existence and height. Plaintiff's Ex. 9, Amendatory Endorsements.

Wahl and Gagnon testified that the vents on the work deck of the ALLIED RESOURCE should have been higher.[15] Tr. at 391, 466. Wahl and Gagnon testified that had the vents been higher, water could not have down-flooded into the watertight compartments. However, neither testified that that the vessel was unseaworthy per se because the height of the vents. Tr. at 391, 465–66. The gist of the testimony of both witnesses was that the height of the vents contributed to the loss of the ALLIED RESOURCE because it allowed water to enter the otherwise watertight compartments once more than twelve inches of water was present on the work deck.[16] On this record, Acadia has failed to meet its burden to establish that the height of the vents created an unseaworthy condition.

### 3. Presumption of Unseaworthy Condition

Plaintiff asserts that because the vessel sank in calm seas, in conditions that the vessel could reasonably be expected to withstand, a presumption of unseaworthiness arises. *See, e.g., Pace v. Ins. Co. of North America,* 838 F.2d 572, 577 (1st Cir.1988). Defendants respond that the presumption of unseaworthiness has been rebutted by the competing evidence introduced at trial about the conditions of the vessel and the training and expertise of Weidman and the events surrounding the loss. *See id.* at 577 (presumption of unsea-

worthiness is rebuttable by the existence of facts from which a factfinder could conclude otherwise); *P.T. Tugs, Inc. v. United States Fire Ins. Co.* 796 F.2d 125, 127 (5th Cir.1986). Because the Court has above found that the vessel was unseaworthy at the time of the loss and that it was the unseaworthy condition that caused the loss, it is not necessary to consider the presumption of unseaworthiness issue.

### B. BREACH OF COMMERCIAL USE WARRANTY

In early August 1999, Cranson called Butterworth to notify the insurer that the ALLIED RESOURCE was almost ready to launch and to request navigational coverage, an increased amount of hull, protection and indemnity, and cargo legal liability coverage. Tr. at 21, 69, 211–12, 242; Defendants' Ex. 55, 53. Plaintiff's Ex. 15. Cranson told Butterworth that once the vessel arrived in Maine, it was to be used for hauling cargo. Plaintiff's Ex. 15. Shortly thereafter, Cranson called Butterworth to determine if it was within the protections of the policy to charter the ALLIED RESOURCE for mooring inspection work. Butterworth did not think that such activities were outside the policy's coverage. Tr. at 281. Although Pedersen testified that these activities were not within the commercial use warranty of the policy, he never communicated this to Butterworth or Cranson.

It is undisputed that the amendatory endorsement to the commercial use warranty was ever sent to Cranson prior to the loss, except for the commercial use warranty that restricted the coverage to

---

**15.** At trial, Court admitted *de bene esse* Gagnon's testimony about whether the vents can properly be considered unseaworthy. Tr. at 389. The Court now admits that testimony.

**16.** The Court notes that the engine room door was open allowing the engine room to begin to flood before the gooseneck vents would have sent water into the watertight compartments.

port risk only, which was no longer in effect once Acadia delivered the verbal message through Butterworth that navigation coverage had been extended to the vessel. Tr. at 81. It is also undisputed that Cranson never received a new "Commercial Hull Endorsement" page with the full text of the amended provisions. Acadia asserts, however, that an oral contract or binder for interim insurance was in effect when the ALLIED RESOURCE sank and that such agreement included a commercial use warranty that unambiguously excludes coverage for the recreational diving activities in which Weidman was engaged when the vessel sank. Defendants argue that although the "port risk only" restriction was lifted, there was no use warranty in effect at the time the ALLIED RESOURCE sank because Defendants did not receive a copy of the amendatory endorsement until after the vessel sank. Acadia responds that the language of the amendatory endorsement, setting forth the vessel use warranty, was effective even though it was not received by the insured before the casualty because it was a normal feature of Acadia's policies.

 The Court finds that Acadia issued its binder lifting the port use only restriction on August 13, 1999. The general rule regarding the terms of an oral binder or contract for temporary insurance pending issuance of a written policy consists, in the absence of a special agreement, of the usual provisions of contracts employed to effect like insurance. *See, e.g., Pine Ridge Realty, Inc. v. Mass. Bay Ins. Co.,* 2000 ME 100, ¶ 14, 752 A.2d 595, 599 (2000); *Matousek v. South Dakota Farm Bureau Mutual Ins. Co.,* 450 N.W.2d 236 (S.D.1990); *Zimmerman Leasing Co., Inc. v. Williams,* 64 Ohio App.3d 623, 624–25, 582 N.E.2d 631, 632 (1989); *First Protection Life Ins. Co. v. Compton,* 230 Va. 166, 169–70, 335 S.E.2d

262, 264–65 (1985); *Robinson v. State Farm Mutual Automobile Ins. Co.,* 188 Neb. 470, 472, 197 N.W.2d 396, 397 (1972); *Harmon v. American Interins. Exchange Co.,* 39 Mich.App. 145, 148, 197 N.W.2d 307, 309–10 (1972); *De Cesare v. Metropolitan Life Ins. Co.,* 278 Mass. 401, 406, 180 N.E. 154, 156 (1932); 43 Am. Jur. 2D *Insurance* § 222 (1982). That is, where the parties to a temporary contract for insurance do not specifically agree upon all the essential terms, they are presumed to have contemplated the terms, conditions, and limitations in the ordinary form of the policy usually issued by the company at that time on similar risks. *See, e.g., Pape v. Mid–America Preferred Ins. Co.,* 738 S.W.2d 882 (Mo.App.1987); *Alabama Farm Bureau Mutual Casualty Ins. Co. v. Adams,* 289 Ala. 304, 311, 267 So.2d 151, 156–57 (1972); *Turner v. Worth Ins. Co.,* 106 Ariz. 132, 133, 472 P.2d 1,2 (1970); *National Emblem Ins. Co. v. Rios,* 275 Cal.App.2d 70, 76, 79 Cal.Rptr. 583 (1969) *Parlier Fruit Co. v. Fireman's Fund Ins. Co.,* 151 Cal.App.2d 6, 21, 311 P.2d 62, 71 (1957); 43 Am. Jur. 2D *Insurance* §§ 167, 222. Defendants argue that these cases regarding interim insurance are distinguishable because they apply only to "normal" provisions of policies and that the use warranty is not a normal provision of Acadia's policies, but is an exclusionary provision, tailored specifically for each policy.

The Court disagrees. The commercial use warranty is a standard provision in Acadia's commercial hull policies, usually issued by the company at that time upon similar risks. Acadia's standard commercial use warranty language was included in the port risk only policy. Plaintiff's Ex. 9. The commercial use warranty included in the original port risk policy states Acadia's standard commercial use warranty. The commercial use warranty is a standard provision in Acadia's policies despite the fact that the commercial use in the war-

ranty may vary from vessel to vessel. Tr. at 336. The individualized statement of a vessel's commercial use does not extend the entirety of the use warranty beyond the typical Acadia policy. In addition, the testimony established that if occasional recreational use were authorized, Acadia would have attached a special endorsement to that effect. Tr. at 329.

The Court also disagrees with Defendants alternative argument that the amendatory endorsement eliminated the vessel's commercial use warranty and replaced it with a vessel use provision which states: "6. Vessel Use shall read: 'hauling cargo to and from costal islands.'—see attached."[17] Plaintiff's Ex. 9. That is, that the amendatory endorsement containing the amendment to the commercial use warranty, but not the full text of the commercial use warranty, becomes the sole text of the provision. If this were the case, the policy would no longer contain language of warranty. There is no evidence in the record that either party intended to eliminate the warranty language from the insurance policy. In fact, the evidence showed that the use language from the amendatory endorsement should have been inserted into the use warranty language of the policy. Plaintiff's Ex. 11. The document that should have been attached to the amendatory endorsement—providing the full text of the commercial vessel use warranty—also supports the Court's conclusion. Plaintiff's Ex. 13. The Court concludes, therefore, that there was an oral contract for interim insurance coverage that included the following commercial vessel use warranty:

> Warranted that the insured vessels be used for no commercial purpose other than hauling cargo and equipment to

and from coastal islands and coverage shall not be provided for any other activity unless endorsed herein.

Plaintiff's Ex. 9.

Neither the parties nor the Court have been able to find any cases interpreting this or other similar commercial use warranty provisions in a contract for marine insurance. However, under both federal and state law, the fundamental rule is that the insurance contract is to be construed in accordance with the intention and reasonable expectation of the parties. *See Central International Co. v. Kemper National Insurance Cos.,* 202 F.3d 372, 373–74 (1st Cir.2000); *Maine Drilling & Blasting Inc. v. Insurance Co. of North America,* 665 A.2d 671, 673 (Me. 1995); *Whit Shaw Assocs. v. Wardwell,* 494 A.2d 1385, 1387 (Me.1985)("the paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in the light of all the circumstances under which it was made" ) (citation and internal quotation marks omitted). As is the case with other contracts, unambiguous provisions contained in insurance policies are to be interpreted as written, giving force to their plain meaning. *See Jack v. Tracy,* 1999 ME 13, ¶ 8, 722 A.2d 869, 871 (1999). Nonetheless, some special rules apply to insurance policies. *See, e.g., Foundation for Blood Research v. St. Paul Marine & Fire Ins. Co.,* 1999 ME 87, ¶ 11 730 A.2d 175, 180 (1999) (reaffirming time-honored tenet that insurance policies are liberally construed in favor of the insured). Insurance policy language is to be construed against the insurer and in favor of maximizing coverage. *See Foundation for Blood Research,* 730 A.2d at 180; *Geyerhahn v.*

---

**17.** The parties do not dispute that the amended endorsement Cranson received after the loss did not have anything attached to it.

*United States Fid. & Guar. Co.*, 1999 ME 40, ¶ 12, 724 A.2d 1258, 1261 (1999). Under applicable insurance law precedent, if an ordinary person would not understand, with some degree of assurance, that the provision has a single accepted meaning, ambiguity looms. *See Craig v. Barnes*, 1998 ME 110, ¶ 12, 710 A.2d 258, 261 (Me. 1998); *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 386 (Me.1989).

██ Under either federal or state law precedent, Acadia asserts, the unambiguous language of the commercial use warranty requires the Court to find that Weidman's recreational use was outside the protection afforded by the policy and, thus, Acadia is not liable under the policy for the use which occasioned the loss. Acadia argues that the use warranty, read literally, requires that the vessel be used only for "hauling cargo and equipment to and from costal islands" as a condition of coverage.[18] Defendants respond that Weidman was using the boat to haul his dive equipment to Mark Island and back on the day of the loss. The Court finds that the language of the commercial use warranty is unambiguous.

From the evidence presented at trial, the Court determines the intent and reasonable expectation of the parties was that the ALLIED RESOURCE would be hauling cargo to and from coastal islands. This is explicitly what Cranson told Butterworth and what Butterworth, in turn, communicated to Acadia. *See* Plaintiff's Ex. 15 at 2. This finding is supported by the evidence presented at trial that Cranson called Butterworth to ask whether he had insurance coverage when the AL-LIED RESOURCE was going to be used for other types of activities. For example, Cranson called, on at least one occasion, to discuss with Butterworth coverage for using the vessel to inspect moorings. At all times, Cranson acted consistently with hauling cargo being the controlling policy language. Although Cranson could rely on his conversation with Butterworth to conclude that the use of the vessel for mooring inspections was not outside the warranty of the policy and inspecting moorings involves diving from the AL-LIED RESOURCE, it was not reasonable for Cranson to assume that any diving activity was within the commercial use warranty.[19]

Cranson also testified that he called Butterworth and asked him whether Weidman could take the vessel to attempt to retrieve anchors from the ocean near Matinicus Island. Cranson testified that his purpose in making this request was to confirm that he would have insurance coverage. Cranson further testified that Butterworth replied that it would not violate coverage. Tr. at 513. Butterworth testified that he did not recall any such conversation with Cranson. Tr. at 282, 279. Butterworth kept detailed notes of conversations he had with Cranson, but his file contains no notes reflecting that such conversation ever occurred. Aside from Cranson's testimony, the record contains no evidence that anyone at C.M. Bowker or Acadia had told Cranson that he had insurance coverage for Weidman to take the ALLIED RESOURCE to Matinicus Island to recover anchors. Although the Court has found

---

18. Acadia refers to a requirement that the ALLIED RESOURCE haul cargo "for hire." The words "for hire" do not appear anywhere in any insurance policy document. Plaintiff's Ex. 7; Tr. at 343.

19. The Court notes that Butterworth's documentation from of his conversation with Cranson regarding the use of ALLIED RESOURCE to inspect moorings indicates that Cranson would continue to serve as master of the vessel. Tr. at 267–69; Defendants' Exs. 57 and 140 at 52.

that Cranson was never authorized by Butterworth or Acadia to allow Weidman to engage in diving for anchors off Matinicus Island, Cranson's testimony that he called to check if he had coverage supports the Court's finding that Cranson reasonable expectation and understanding was that the commercial use warranty limited the covered use of the vessel to "hauling cargo" unless otherwise authorized by Acadia.

At the time the ALLIED RESOURCE sank, Weidman was using the vessel to locate an acceptable place to conduct final dives to certify the individuals in his dive class. There can be no doubt that the ALLIED RESOURCE was being used for a purpose outside the commercial use warranty at the time of the loss and that coverage was not extended for such use by Acadia or its agents. This use was personal to Weidman and wholly unrelated to hauling cargo. No rational interpretation of the commercial use warranty allows coverage for this purely recreational use that, prior to the loss, was never disclosed to Acadia.

This Court has found that Cranson breached the express warranty of seaworthiness and the commercial use warranty in the policy. Breaches of express warranties in marine insurance contracts are covered by admiralty rule and release the insurer from any liability under the policy. *See, e.g., Hilton Oil Transport v. T.E. Jonas,* 75 F.3d 627, 630 (11th Cir.1996). Therefore, under the established federal rule, Defendants' breach of the express warranty of seaworthiness and the commercial vessel use warranty voids the policy.

### C. UBERRIMAE FIDEI

Another established federal rule is the doctrine of *uberrimae fidei. See Steelmet, Inc. v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir.1984). Under this doctrine, every insured is under an obligation of "utmost good faith" to disclose to the insurer all circumstances that materially affect the insurer's risk, the default of which duty renders the insurance contract voidable by the insurer. *See Windsor Mt. Joy,* 57 F.3d at 54–55. Plaintiffs argue that Defendants' failure to disclose material facts, such as the fact that Defendants were not able to use the vessel to transport cargo for hire because it had no Coast Guard Certificate of Inspection ("COI"), that the vessel would be used for other purposes, and that solely Weidman would man the vessel, voids the policy. With respect to the COI, Plaintiff relies on Pedersen's testimony that he would never agree to cover an LCM–6 that was to be used to carry cargo without a COI because it would be a "violation." Tr. at 310. The Court nevertheless finds that Cranson never told Butterworth the vessel would have a COI. Tr. at 274. Neither Butterworth nor Cranson ever told Pederson that the ALLIED RESOURCE would have a COI. Tr. at 333–34. Although the first, generic request submitted by Butterworth to Acadia for insurance quotes on an LCM–6–type vessel stated that such vessel would be Coast Guard inspected, Plaintiff's Ex. 5A, Cranson never signed that application and never told Butterworth, in completing the application for insurance on the ALLIED RESOURCE, that it would carry a COI, Plaintiff's Ex. 7. It appears to the Court that the confusion over the COI may have arisen out of Pedersen's reference to the initial generic application. The initial application was later superseded by the application for insurance for the ALLIED RESOURCE. Moreover, Cranson later told Butterworth that he did not have a COI and that he would not be getting one in the future. Whatever the cause of the confusion, Pedersen could have required a COI as a condition of coverage, but he did not. Tr. at 335. With respect to alterna-

tive uses of the vessel, Acadia claims that were it not for the assurances that the vessel would carry a CQI, it would not have agreed to insure the ALLIED RE-SOURCE. The Court finds that Cranson did communicate to Butterworth, Acadia's agent, that the vessel would be used for other purposes. Given these facts, the Court will not apply the doctrine of *uberrimae fidei.*

With respect to the fact that Weidman solely manned the vessel, the Court finds that the policy does not have a minimum manning requirement and, by eliminating the crew coverage, the policy indeed contemplates the operation of the vessel by one individual. Therefore, there was no breach of the doctrine of *uberrimae fidei* on either basis.

## D. ESTOPPEL

█ Defendants argue that Acadia should be estopped from denying coverage because Acadia's conduct in accepting Cranson's assistance after the loss was inconsistent with an insurance policy that is void *ab initio* because of breach of warranty. Defendants rely on *Reliance Insurance Co. v. The Escapade,* 280 F.2d 482 (5th Cir.1960), to support their estoppel theory. Plaintiff responds that there is no comparable case in the First Circuit regarding the question of estoppel in a marine insurance contract and, therefore, the precedent should not apply. In the alternative, Plaintiff argues that even if the law of estoppel is applicable, Defendants cannot prevail because *The Escape* is distinguishable from the facts of the instant case.

In *The Escapade* the insurance agent learned, a few days after the yacht's stranding, that the clause prohibiting charter of the yacht absent the insurer's permission had been breached on the day of the stranding. Thereafter, the agent re-fused to accept abandonment and declined to take action pursuant to the policy, thereby putting the full responsibility of salvage on the insured. Moreover, the agent communicated to the insured that the insurer would disclaim any further liability if the insured did not arrange for salvage of the yacht. Subsequently, the insurer informed the insured that it was not accepting liability in connection with the yacht's accident. Recognizing the general rule that the doctrines of waiver and estoppel may not be utilized to extend coverage, the court stated:

> But the estoppel here found as a fact by the District Court does not create a new liability or grant a coverage not already in the policy. As we pointed out this hull policy by traditional language reflecting the even more ancient traditions of marine underwriters intends to, and does, cover expressly damage from perils of the seas. Stranding is a peril of the sea. So is pounding from the angry waves. Liability under the policy will be absent not because the peril is not covered, but because action of the Assured in chartering the Yacht has ostensibly "forfeited" the policy coverage otherwise existing.

*Id.* at 487. Since the private pleasure warranty merely provided a defense to coverage, the court held that "it may be waived or the underwriter may be estopped to assert it, and doing so is not expanding or creating a new coverage." *Id.* Since the insurer had knowledge of the breach of warranty, its demand that the insured undertake the salvage operation or run the risk of losing its right to insurance proceeds, which demand was inconsistent with the subsequent denial of coverage, had the effect "of reviving the contract obligation theretofore 'forfeited' for breach of warranty or other policy provision." *Id.* at 490 (footnote omitted).

*The Escapade* has no applicability to the facts of this case. Unlike the insurer in *The Escapade*, Acadia and its agents took responsibility for the salvage operation. Acadia never demanded that Defendants take any steps to salvage the ALLIED RESOURCE while knowing the policy would not cover the loss. Although Acadia's letter of November 18, 1999, stated that "it is important that Allied Marine Transport, LLC act as a prudent uninsured," Plaintiff's Ex. 25, Acadia never put the responsibility, financially or otherwise, for salvage on Defendants. Cranson and Weidman's actions in arranging for vessels to take Gagnon to the site of the sinking and their cooperation in locating the ALLIED RESOURCE were undertaken voluntarily any without any encouragement from Acadia. The Court concludes, therefore, that the estoppel analysis has no applicability in this case.

### III. CONCLUSION

The Court **DECLARES** that Acadia Insurance Policy No. CHA 0046918–10 is void and, therefore, that Plaintiff Acadia Insurance Company has no liability under the policy for any claims arising out of the loss of the ALLIED RESOURCE.