**Frank P. GRANDE, Plaintiff,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY and Charter Lakes Marine Insurance, Defendants.**

**No. CV–03–177BW.**

United States District Court,
D. Maine.

April 15, 2005.

Michael X. Savasuk, Law Office of Michael X. Savasuk, Portland, ME, for Frank P Grande, Plaintiff.

Mark G. Furey, Thompson, Bull, Furey, Bass & Maccoll, LLC, P.A., Portland, ME, for St Paul Fire & Marine Insurance Company, Charter Lakes Marine Insurance, Defendants.

## ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW

WOODCOCK, District Judge.

Claiming a failure to pay under an unissued trip insurance policy, a customer filed suit against an insurer and its agency for losses to a vessel damaged in transit. At the conclusion of the Plaintiff's case during a jury trial, the Defendants made an oral Motion for Judgment as a Matter of Law pursuant to Fed.R.Civ.P. 50(a). Because the Plaintiff produced no evidence trip insurance exists and would have been available to cover the claimed loss, and because any insurance contract, if issued, would have been voidable under the doctrine of *uberrimae fidei,* this Court GRANTS the Defendants' Motion for Judgment as a Matter of Law.

### I. LEGAL STANDARD

A motion for judgment as a matter of law is controlled by Rule 50.[1] Fed.

---

1. Rule 50 provides in pertinent part:
   (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that

R.Civ.P. 50. The standard for granting judgment as a matter of law "mirrors" the standard for granting summary judgment, such that the "inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A motion for judgment as a matter of law "only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir.2001). In performing this review, the court "may not weigh the evidence, undertake credibility determinations, or engage in differential factfinding." *Id.*

## II. FACTS

Frank P. Grande, a resident of Waterville, Maine, owned and operated APHRODITE, a 25–foot Catalina sail vessel, which he chartered off the Maine coast. He obtained charter insurance through Defendant Charter Lakes Insurance Company of Kentwood, Missouri (Charter Lakes), a marine insurance agency, which placed coverage with Defendant St. Paul Fire & Marine Insurance Co. (St.Paul). The St. Paul policy was for the policy term from

June 3, 2002 through June 3, 2003.[2] *Defendant's Exhibit* 11.

Mr. Grande dreamt of owning a bigger vessel. In the spring of 2003, he went South on business and visited his cousin, Frank A. Grande.[3] The cousins had known each other growing up and had remained close. Frank A. Grande had been successful in the real estate and construction business in Texas and, after discussing Frank P. Grande's plans to buy and charter a larger vessel, Frank A. Grande made a generous offer. He agreed to loan Frank P. Grande the money to purchase a bigger boat.

Frank P. Grande set about searching for a new vessel. In south Florida, he came upon what he was looking for: GINA, a 44–foot Irwin. He told his cousin about the GINA and Frank A. Grande ended up purchasing the boat for him.[4] Once the purchase price of $75,000.00 was fixed, Frank A. Grande paid the full $75,000.00 to the seller; Frank P. Grande paid no money toward the purchase of the GINA. A Purchase and Sale Agreement dated April 27, 2003 and April 28, 2003, *Joint Exhibit* J1, and a Bill of Sale dated April 29, 2003 were entered into between the seller and Frank A. Grande. *Defendant's Exhibit* 18. Frank P. Grande was not listed as owner or buyer on either document. *Id.*

party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
Fed.R.Civ.P. 50.

**2.** Frank P. Grande had owned APRHODITE since October 1991 and initially used the vessel solely for pleasure. He later began to charter the vessel from Tenant's Harbor, Maine and was insured prior to 2002–03 with St. Paul through Charter Lakes. However, because of the expense of coverage, he did not purchase insurance for the year 2001–02 and

when he obtained charter insurance for 2002–03, he was treated as a new customer. *Defendants' Exhibit* 13.

**3.** Frank A. Grande was originally a party Plaintiff in this case, but upon his motion, was dismissed with prejudice after jury selection.

**4.** Frank A. Grande's exact involvement in the purchase of the GINA, as will be seen, is difficult to characterize precisely.

Frank P. Grande intended to sail the GINA to Maine, but before he did so, he needed insurance.[5] He contacted Mark VanEpps, an insurance agent with Charter Lakes and told him, he needed to add the GINA to the charter policy, remove the APHRODITE, and obtain coverage for the trip from Florida to Maine. On April 28, 2003, Mr. VanEpps faxed a letter to Frank P. Grande, providing him with a quote. The letter begins: "Thank you for contacting us regarding your Charter Insurance." It quotes a price for insuring the GINA for $2,094.00 and lists the coverage provided by the policy and their limits. It also enclosed an application for Frank P. Grande to complete, sign and return, and requests a boat survey. The letter expressly notes that this is a quote only and coverage is "**NOT BOUND.**" Finally, the following language appears in the letter:

> The coverage is underwritten by St. Paul Fire & Marine Insurance Co., an A+ rated company. The annual premium for the above coverage is $2,094.00. There will be a one-time trip fee of $150.00 for navigating your boat from Coconut, FL to your homeport of Long Cove, ME. We will take the Catalina off the policy and pro-rate a return premium on that boat for you, and apply it to this premium, and invoice the remaining balance due.

*Joint Exhibit* J2B.

On April 28, 2003, Frank P. Grande faxed an insurance application to Charter Lakes. *Joint Exhibit* J2C. The insurance application asks the name of the "Registered Owner or Lessee" and indicates the applicant is to list "all registered owners." Frank P. Grande wrote in his name and did not list his cousin. In addition, the application asks whether the vessel is to be owner operated and Frank P. Grande answered, "Yes." Finally, it asks whether the vessel is to be operated by anyone other than the owner and Frank P. Grande again listed his name only as the owner operator. The insurance premium was paid for by Frank A. Grande, not Frank P. Grande. After sending the application and other information to Mr. VanEpps, Frank P. Grande called him some time before leaving port and confirmed that the GINA was insured both for charter insurance and the trip to Maine.

On May 5, 2003, Mr. Grande left port in Florida, heading for Maine. On May 16–17, 2003, GINA ran into heavy weather off the coast of Cape Hatteras and the crew issued a "PAN" call. They were rescued by the United States Coast Guard; GINA, however, sustained damages that are the focus of this lawsuit.

After the May 16–17, 2003 incident, Frank P. Grande received a binder and policy from the Defendants. *See Plaintiff's Exhibit* 8. The policy was for charter insurance and contained an endorsement that provided coverage to Mr. Grande for the trip from Florida to Maine. The policy, however, retained the 100 mile navigational limit that had been imposed in the APHRODITE policy. Frank P. Grande never received a separate policy for trip insurance. On May 22, 2003, St. Paul issued a reservation of rights letter to Frank P. Grande, raising questions about whether coverage existed under the charter insurance policy for the losses sustained to the GINA. *Plaintiff's Exhibit* 20. This letter was followed by a letter dated August 12, 2003, denying coverage on the ground that Frank P. Grande had exceed-

---

5. The APHRODITE policy contained two territorial limits: 1) a navigational limit of no more than 100 miles off shore; and, 2) coverage only for the area between Eastport, Maine and St. Marys, Georgia. As the GINA was to be sailed from near Miami to Maine, the southern limit to the policy had to be removed for this trip.

ed the 100 mile navigational limit in the policy. *Plaintiff's Exhibit* 23.

## III.  DISCUSSION

### A.  The Trip Insurance Policy

■ In his Complaint, the Plaintiff claimed the Defendants agreed "to provide marine insurance without any navigational limits" and when it imposed navigational limits and denied coverage on that basis, they breached "their contracts." Plaintiff's Complaint ¶ 25. At trial, however, the Plaintiff abandoned his claim that the Defendants breached the terms of the charter insurance policy; instead, he claimed the loss should have been paid under a trip insurance policy.[6] Mr. Grande contended that when he informed the insurance agent he wished to have coverage for a trip to Maine and the agent agreed to provide such coverage, this established an obligation on the part of the insurer and the agency to pay any loss to the vessel occurring during the trip. In other words, the insurer and agency were held to the quote without any limiting terms and conditions. Because the agent had written there "will be a one-time trip fee of $150.00 for navigating your boat from Coconut, FL to Long Cove, ME" and the loss occurred on the way to Maine, Mr. Grande says it must have been a covered loss.

Simply put, the Plaintiff's contention is erroneous. First, as the April 28, 2003 letter makes clear, the letter was an insurance quote, not an insurance binder. ("If you need coverage immediately, please call us... to bind coverage. Coverage is **NOT BOUND**. This quote is valid only for 30 days."). This is a quote without a policy. Any insurance quote is subject to acceptance, to the issuance of an insurance binder, and to the terms and conditions of a later issued insurance policy. There is no basis for claiming the April 28, 2003 letter alone constituted an insurance contract

---

6. In his Opening, Mr. Savasuk distinguished between charter insurance and trip insurance policies and he emphasized the agent assured him he had both types of insurance. Frank P. Grande testified to the same thing. During argument on the Rule 50 motion, Mr. Savasuk agreed the claim "is not under the policy that was issued" and "the charter insurance policy is not the policy that is applied in this case." He explained "the contract that they entered into is that they were going to provide insurance as quoted." Other than the general restriction that the vessel was covered for a trip from Florida to Maine, Mr. Savasuk contended the trip insurance policy contained "no other restrictions." At one point during the argument, Mr. Savasuk seemed to change tacks and sail with the prevailing wind, saying he was claiming under the charter contract as well; however, having argued only the trip insurance theory in his Opening and having presented evidence solely on that theory, he later returned to the basic premise that the Defendants were required to provide trip insurance from Florida to Maine without restriction.

The Plaintiff's decision to proceed only on the trip insurance policy theory and not under the charter policy endorsement may have been a wise one. The trip endorsement was made part of the underlying policy and the 100 mile navigational limit was still in force. Although the Plaintiff argued he was blown off course by water spouts and exceeded the navigational limits only to save life and property, the GPS coordinates may have placed the GINA outside the 100 mile limit just before the water spouts were encountered and it appeared the GINA remained outside the limits for a substantial period after the danger had passed. The rescue was necessitated primarily by a shredded lower stay and rough weather. If the charter policy were applicable, the Plaintiff may have faced insurmountable problems of proof and this may explain his strategic decision to argue the Defendants had agreed to issue a separate trip policy without any such limits. In any event, having elected his cause of action, he could not seek to survive the Rule 50 motion by changing theories after he had put his case in, since the Defendants had relied on his election in defending the case.

upon which a cause of action for insurance proceeds could be based.

In this case, Frank P. Grande testified Mr. VanEpps confirmed before the GINA left port, that a binder had issued and the GINA was "free to go." He stressed that, when Mr. VanEpps informed him that the binder had issued, he made no mention of any navigational limits. The Plaintiff, therefore, contends that the binder must have been without navigational limit, except to the extent it was limited to a trip from Florida to Maine.

█ As Judge Carter explained, however, the "general rule regarding the terms of an oral binder or contract for temporary insurance pending issuance of a written policy consists, in absence of a special agreement, of the usual provisions of contract employed to effect like insurance." *Acadia Ins. Co. v. Allied Marine Transp. LLC*, 151 F.Supp.2d 107, 125 (D.Me.2001); *see Pine Ridge Realty, Inc. v. Massachusetts Bay Ins. Co.*, 2000 ME 100, 752 A.2d 595, 599 (2000) ("In the insurance context, when a loss occurs after a binder has been issued, but before a policy is written, the insurer is bound to provide coverage in line with its standard policies referenced in the binder (citations omitted) or policies standard throughout the industry."). The Charter Lakes insurance binder required St. Paul to write coverage at the quoted price in accordance with its standard terms and conditions.[7] Here, Frank P. Grande is claiming that so long as the GINA sustained a loss during his proposed trip from Florida to Maine, the April 28, 2003 quote together with the VanEpps later confirmation of coverage created a binding obligation on the Defendants to pay any loss with "no other restrictions."[8] The Plaintiff's entire case, therefore, rests on an insurance quote, not an insurance policy. His fundamental contention is not the law.

█ There is a separate reason the Plaintiff's claim fails. To survive a Rule 50 motion, the Plaintiff was required to produce some evidence that the trip insurance he is claiming would have covered the loss exists and could have been provided either by St. Paul or elsewhere. *Royal Maccabees Life Ins. Co. v. Peterson*, 139 F.3d 568, 570 (7th Cir.1998); *Huff v. Standard Life Ins. Co.*, 897 F.2d 1072, 1074 (11th Cir.1990), *cert. denied* 499 U.S. 936, 111 S.Ct. 1386, 113 L.Ed.2d 443 (1991); *Wilson v. Massachusetts Indem. & Life Ins. Co.*, 920 F.2d 1548, 1553 (10th Cir.1990); *Lifespan/Physicians Prof'l Servs. Org. v. Combined Ins. Co. of Am.*, 345 F.Supp.2d 214, 227–28 (D.R.I.2004); *American Motorists Ins. Co. v. Salvatore*, 102 A.D.2d 342, 476 N.Y.S.2d 897, 900 (N.Y.App. Div. 1st Dep't 1984) (an insurance agency may be liable in tort or contract for failing to procure insurance; "in order to support a recovery, it must be demonstrated that coverage could have been procured prior to the occurrence of the insured event."); *State ex rel. Fisher v. Warren Star Theater*, 84 Ohio App.3d 435, 616 N.E.2d 1192, 1196–97 (Ohio Ct.App., Trumbull County 1992)("(T)hird party plaintiffs failed to present any evidence to establish what the terms of the coverage would have been on the... policy that they had requested."); *Bayly, Martin & Fay, Inc. v. Pete's Satire,*

---

7. The insurance binder Charter Lakes issued on behalf of St. Paul is an example of what a binder is. *Defendants' Exhibit* 10. It states that the binder is "a temporary insurance contract subject to the conditions shown at the bottom of this form." The bottom of the form expressly states that the insurance contract is "subject to the terms, conditions and limitations of the policy(ies) in current use by the company." *Id.* at 2.

8. This phrase is Mr. Savasuk's at oral argument on the Rule 50 motion.

*Inc.*, 739 P.2d 239, 243 (Colo.1987)(quoting *Heller–Mark & Co. v. Kassler & Co.*, 37 Colo.App. 267, 544 P.2d 995, 997 (1976) ("The law is well established that the plaintiff must show...that other insurance could have been obtained, which requirement arises out of the plaintiff's obligation to prove causation and damages."); *Russell v. Reliance Ins. Co.*, 672 S.W.2d 693, 694 (Mo.Ct.App.1984) ("If there was no insurance that could be purchased insuring against the peril causing the loss then any negligence of respondent would not be the proximate cause of appellant's damages.").

.This rule has been applied in actions involving the procurement of insurance for vessels. *See Stinson v. Cravens, Dargan & Co.*, 579 S.W.2d 298 (Tex.Civ.App.Dallas 1979) (in negligence action by boat owner against insurance agent for failure to obtain insurance on boat, failure of owner to prove coverage was available under any policy was fatal to claim); *Pacific Dredging Co. v. Hurley*, 65 Wash.2d 394, 397 P.2d 819 (1964) (dredge owner's action against insurance broker for negligently failing to extend or renew maritime insurance dismissed where owner failed to prove that the requested insurance, even if obtained, would have insured against the loss).

In the only Maine state case on point, Justice Hjelm of the Maine Superior Court concluded to make out a claim under either negligence or breach of contract, the purported insured must present "some evidence to allow a finding" that the coverage he is looking for "would have been available." *Bangor–Brewer Bowling Lanes v. Commercial Union–York Ins. Co.*, CV–99–259, 2001 WL 1719238, 2001 Me.Super. LEXIS 174 (Me.Super.Ct.Pen.Cty., July 3,

2001); *cf. Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶¶ 13–14, 742 A.2d 933, 940 (in legal malpractice claim to prove proximate causation, plaintiff must prove that proper representation would have resulted in more favorable outcome).

Moreover, the majority rule is that the plaintiffs bear the burden of proving that coverage was available for the loss. *Bangor–Brewer*, 2001 WL 1719238, at *4, 2001 Me.Super. LEXIS 174 at *16; *Johnson & Higgins v. Blomfield*, 907 P.2d 1371, 1374 (Alaska 1995); *Bayly, Martin & Fay, Inc.*, 739 P.2d at 239–44; *see generally Liability of Insurance Agent or Broker On Ground of Inadequacy of Liability Insurance Coverage Procured*, 60 A.L.R.5th 165 *5 (2004).

The Plaintiff offered no evidence that St. Paul wrote trip insurance as a stand alone form of insurance and no evidence that Charter Lakes or another agency could have procured stand alone trip insurance from other insurers. As such, the Plaintiff offered no evidence of what terms and conditions such a policy would have contained and whether such insurance, if available, would have covered the GINA's damages. Moreover, there is no evidence that the Plaintiff's more extreme position, that trip insurance with "no other restrictions" would have been issued by any insurer, including St. Paul. His claim, therefore, fails as a matter of law.[9]

### B. *Uberrimae Fidei*

### 1. The Contract Claim

A breach of contract claim consists of the following elements: (1) there was an offer; (2) there was an acceptance of that offer; (3) there was consideration by each

---

**9.** This ruling applies with equal force to the negligence and equitable estoppel claims, because the Plaintiff would still have to show causation under any legal theory: that there would have been coverage available that would have paid the loss if not for the acts of the Defendants.

of the parties; and, (4) there was a meeting of the minds, or mutual assent. *See Searles v. Trustees of St. Joseph's College*, 1997 ME 128, ¶ 13, 695 A.2d 1206; *Dom J. Moreau & Son, Inc. v. Federal Pacific Electric Co.*, 378 A.2d 151, 153 (Me.1977). For a contract to be enforceable, "the parties thereto must have a distinct and common intention which is communicated by each party to the other." *Stanton v. Univ. of Maine Sys.*, 2001 ME 96, ¶ 13, 773 A.2d 1045. Further, "the mutual assent to be bound by all of its material terms must be reflected and manifested either expressly or impliedly in the contract and the contract must be sufficiently definite to enable a court to determine its exact meaning and fix any legal liability of the parties." *June Roberts Agency v. Venture Props.*, 676 A.2d 46, 48 (Me.1996).

■ An insured must disclose in an application for insurance all known circumstances that materially affect the insurer's risks. *Marchiori v. American Republic Ins. Co.*, 662 A.2d 932, 934 (Me.1995) (discussing misrepresentation under Maine insurance law). In maritime insurance, this rule is particularly stringent. Maritime insurance policies are "traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir.1995) (quoting *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316, 48 S.Ct. 512, 72 L.Ed. 895 (1928)). This doctrine imposes "a strict duty on the insured to disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which duty renders the insurance contract voidable by the insurer." *Id.; N.Y. Marine & Gen. Ins. Co. v. Tradeline, L.L.C.*, 266 F.3d 112 (2d Cir.2001); *Acadia Ins. Co.*, 151 F.Supp.2d at 128 ("Under this

doctrine, every insured is under an obligation of 'utmost good faith' to disclose to the insurer all circumstances that materially affect the insurer's risk."). In discussing the doctrine of *uberrimae fidei*, Couch states that "good faith and the requirements of the contract of insurance obligate the insured to make a specific and full disclosure of all material facts of which the insured has, or ought to have, knowledge, and all circumstances known to him or her, and unknown to the insurer, which materially affect the risk, even though no inquiry be made." Couch on Insurance 3d § 99:2.

■ Under the federal maritime rule, if the insured is to recover, warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract. *See Reliance Nat'l Ins. Co. (Europe) Ltd. v. Hanover*, 246 F.Supp.2d 126, 135–36 (D.Mass.2003), (citing Patrick J.S. Griggs, *Coverage, Warranties, Concealment, Disclosures, Exclusions, Misrepresentations, and Bad Faith*, 66 Tul. L.Rev. 423, 431–32 (1991)). This rule of strict compliance "stems from the recognition that it is particularly difficult for marine insurers to assess risk, such that insurers must rely on the representations and warranties made by insureds regarding their vessels' condition and usage." *Id.* (quoting *Commercial Union Ins. Co. v. Flagship Marine Servs.*, 190 F.3d 26, 31–32 (2d Cir.1999); *see also Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l)*, 85 F.3d 68, 80–81 (2d Cir.1996).

■ The standard for disclosure "is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material. To be material, the fact must be 'something which would have controlled the underwriter's decision' to accept the risk. The assured's failure to meet this standard

entitles the underwriter to void the policy *ab initio.*" *N.Y. Marine & Gen. Ins. Co.,* 266 F.3d at 123 (prediction of severe rainy weather would have voided marine insurance policy if not disclosed); *Certain Underwriters at Lloyd's v. Montford,* 52 F.3d 219, 222 (9th Cir.1995) (policy void due to misrepresentations about prior loss record, purchase price, and age of vessel); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir.1986) (citations omitted) (no reasonable juror could find that an insurer would not want to know of the cancellation of the insured's prior policy); *Puritan Ins. Co. v. Eagle S.S. Co. S.A.,* 779 F.2d 866, (2d Cir.1985) (failure accurately to reveal prior loss history voids policy); *Pacific Queen Fisheries v. Symes,* 307 F.2d 700, 707 (9th Cir.1962) (contract void *ab initio* due to failure to reveal increased gasoline carrying capacity of vessel); *Fireman's Fund Ins. Co. v. Wilburn Boat Co.,* 300 F.2d 631, 641 (5th Cir.1962) (misrepresentation as to intended use of vessel to carry passengers for hire was material to risk and voided policy); *Reliance Nat'l Ins. Co. (Europe) Ltd. v. Hanover,* 246 F.Supp.2d 126, 137 (D.Mass.2003) (policy void *ab initio* for owner's failure to reveal defects in vessel).

▮ Ownership interests are material to assessing the risk in a marine insurance contract. *See Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.,* 159 F.3d 412, 420–422 (9th Cir.1998), *cert. denied* 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999); *El Fenix de Puerto Rico v. Gutierrez,* 786 F.Supp. 1065, 1066 (D.P.R., 1991) (adopting Report and Recommendation of Magistrate Judge, reported at 1991 U.S. Dist. LEXIS 20857, *15 (D.P.R.1991));

*Washington Int'l Ins. Co. v. Mellone,* 773 F.Supp. 189, 192–93 (C.D.Cal.1990); *HIH Marine Servs. v. Fraser,* 211 F.3d 1359, 1363 (11th Cir.2000); Couch on Insurance § 99:10 (the interest of the insured in a ship "may be of such a character that its concealment . . . is material. . ."); *but see AXA Global Risks (UK) Ltd. v. Pierre,* 2001 WL 1825853 (S.D.Fla.2001).[10]

▮ If a trip insurance contract existed, it would have been voidable, because Mr. Grande did not disclose to the Defendants either his or his cousin's stake in the Gina. The Gina was purchased with funds supplied by his cousin, Frank A. Grande; not Frank P. Grande. Frank A. Grande was on the Bill of Sale and on the Purchase and Sale Agreement; Frank P. Grande was not. Frank A. Grande paid the insurance premium; Frank P. Grande did not. There was no written documentation that Frank P. Grande had any ownership interest in the GINA. The cousins had apparently agreed that, although repayment was not tied to Frank P. Grande's sale of his house in Waterville and the APHRODITE, Frank P. Grande would repay his cousin and they understood he had these properties up for sale. They also had an understanding that when Frank P. Grande got the GINA to Maine, the vessel would be formally placed in his name. At trial, Frank A. Grande conceded there was "a lot of faith and trust in this particular transaction" and it was "not ordinary."

Even if all these facts are accepted, 1) that Frank A. Grande loaned Frank P. Grande the money to buy the GINA; 2) that Frank P. Grande was going to repay

**10.** In *AXA,* the insurer argued that since the insured failed to disclose the fact his wife was the true owner of the vessel, the policy was null and void. *AXA* noted, however, that the insurance application asked for the named insured, but not for the name of the owner of the vessel, so in completing the application,

the insured had not misrepresented ownership. *AXA* at *5. Also, the Court was skeptical of the insurer's contention that if it had known the insured's wife owned the vessel, it would not have issued coverage. *Id.* at *5–6. On its fact, *AXA* is distinguishable from the instant case.

him; 3) that the ownership documents were made out in Frank A. Grande's name only transitorily; 4) that title to the GINA would be transferred to Frank P. Grande in the future; and, 5) that Frank P. Grande and Frank A. Grande considered Frank P. Grande to be the owner, even as he left Florida, the doctrine of *uberrimae fidei* still requires Frank P. Grande reveal these facts to the potential insurer to allow it to assess its risk. *M'Lanahan v. Universal Ins. Co.*, 26 U.S. 170, 185, 1 Pet. 170, 7 L.Ed. 98 (1828) (Story, J.). If he had done so and Defendants had accepted the risk, there would be no issue. Instead, Frank P. Grande not only failed to reveal facts material to the risk, namely the purchase and sale agreement and bill of sale were in someone else's name and he had paid nothing for the vessel, but he also affirmatively misrepresented he was the registered owner, when he was not.

This Court finds that, as a matter of law, the ownership interest of Frank P. Grande and Frank A. Grande are facts that materially affect the insurer's risk. Frank P. Grande's misrepresentation as to the status of ownership of the GINA, both his interest and his cousin's, materially affected the risk to the Defendants, and the policy, if it had issued, would have been voidable.

### C. The Negligence and Equitable Estoppel Claims and *Uberrimae Fidei*

 The doctrine of *uberrimae fidei* applies to the negligence and equitable estoppel claims, but in a slightly different way. These claims are based on the proposition that Charter Lakes breached a duty of due care to Frank P. Grande, because it failed to procure appropriate coverage and misled him as to the scope of existing coverage. To sustain these claims, Frank P. Grande had to show other insurance exists that would have covered the loss and an insurer would have written such coverage, if it had known the true facts of the GINA's ownership. The Plaintiff called as witnesses only Frank P. Grande and Frank A. Grande and there was no evidence that any insurer would have issued trip insurance to Frank P. Grande, if informed of the contingent and undocumented nature of his ownership interest and of the current and documented nature of his cousin's interest.

### IV. CONCLUSION

This Court orders that the Defendants' Motion for Judgment as a Matter of Law be GRANTED.

### SO ORDERED.