# United States Court of Appeals
## For the First Circuit

No. 05-1734

FRANK P. GRANDE,

Plaintiff, Appellant,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY;
CHARTER LAKES MARINE INSURANCE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,

Stahl, Senior Circuit Judge,

and Lynch, Circuit Judge.

Michael X. Savasuk for appellant.
Mark G. Furey with whom Thompson Bull Furey Bass & MacColl
was on brief for appellees.

February 2, 2006

**BOUDIN, Chief Judge**.  This appeal concerns a claim for insurance coverage following a maritime loss.  The matter was decided by the district judge adversely to the plaintiff, Frank P. Grande ("Frank P."), on the defendants' motion for judgment as a matter of law at the close of plaintiff's case during the trial before a jury.  Grande v. St. Paul Fire & Marine Ins. Co., 365 F. Supp. 2d 57, 59 (D. Me. 2005).  We therefore recite the facts based upon the evidence offered by the plaintiff, drawing inferences in his favor.  Guilloty Perez v. Pierluisi, 339 F.3d 43, 50 (1st Cir. 2003).

Frank P. owned a 25-foot Catalina sailboat called APHRODITE, based in Maine.  He had charter insurance for the vessel from St. Paul Fire & Marine Insurance Company ("St. Paul"), obtained through Charter Lakes Marine Insurance ("Charter Lakes"), which was an authorized agent of St. Paul.  The latest version of the policy limited coverage to "Atlantic coastal waters of the United States between Eastport, ME and St. Marys, GA, not more than 100 miles from shore, Coastal Atlantic Maine."

In spring 2003, Frank P. found a new sailboat, a 44-foot Irwin named GINA, in Miami, Florida.  His cousin, Frank A. Grande ("Frank A."), paid for the vessel, on the understanding that Frank P. would own and operate the vessel and eventually pay Frank A. back the purchase price.  Frank P. planned to sail the GINA from Miami back up to Maine and to use it in his charter business in

-2-

place of the APHRODITE. He contacted Mark VanEpps of Charter Lakes, requesting coverage for chartering the vessel in Maine and for his trip from Florida to Maine.

On or about April 28, 2003, VanEpps faxed an insurance quote and application to Frank P., who filled out the application, listing himself as owner and sole operator, and faxed it back to VanEpps. The quote included one-time trip coverage from Florida to Maine for a $150 premium. According to Frank P., he told VanEpps that he wanted to get the GINA from Florida to Maine "in a timely fashion and as the crow flies."

Prior to Frank P.'s departure from Miami on May 6, 2003, VanEpps reported by telephone to Frank P. (who had not yet received the new policy) that he was now covered by St. Paul and thus was "good to go" with the GINA on his voyage to Maine. On the trip to Maine, the GINA sought to evade bad weather near Cape Hatteras, adjusted her course southeast, and was 150 to 160 nautical miles from shore when Frank P. and crew were rescued by the Coast Guard on May 17. The vessel, although later salvaged, was effectively a total loss.

After the incident, Frank P. received a formal St. Paul policy for the GINA dated May 19, 2003 (the day after he had called Charter Lakes to notify it of the loss), containing an endorsement covering the trip but also stating that the GINA was covered only within 100 miles from shore. When Frank P. filed a claim with St.

Paul, it was rejected on the ground that the GINA had been outside the 100-mile limit when the loss occurred.

Several months later, Frank P. brought this diversity suit against St. Paul and Charter Lakes in federal district court in Maine. Frank P.'s contract claim asserted insurance coverage. A separate negligence claim charged Charter Lakes with failing to procure the insurance that Frank P. requested, and with failing to notify him of the supposed 100-mile limit prior to his departure (contrary to its alleged practice in prior dealings with Frank P.). Frank P. also asserted an estoppel claim,[1] arguing that St. Paul was barred from denying coverage because of his justified reliance on their unreasonably misleading conduct.

The case was tried to a jury in April 2005, but after the close of Frank P.'s evidence, the district court granted judgment for the defendants as a matter of law. Grande, 365 F. Supp. 2d at 59. In substance, the court said that Frank P. had failed to establish contract coverage for the trip he took; that any insurance coverage he did procure was voidable because of the failure to disclose Frank A.'s interest; and that the negligence

---

[1]Estoppel is not ordinarily viewed as an independent cause of action, but as a set of rules preventing someone in specified circumstances from altering or contesting a proposition. Prosser & Keeton on Torts § 105, at 733 (5th ed. 1984). Maine case law is unclear. Compare Waterville Homes, Inc. v. Me. Dep't of Transp., 589 A.2d 455, 457 (Me. 1991) (noting that estoppel functions only as "an equitable affirmative defense"), with Martin v. Prudential Ins. Co., 389 A.2d 28, 30-32 (Me. 1978) (treating equitable estoppel as an independent theory of recovery).

and estoppel claims foundered because of the non-disclosure and because Frank P. had failed to show that anyone else would have insured him outside the 100-mile limit. Id. at 62-67.

On this appeal, review is de novo because the district court granted judgment as a matter of law, and we take Frank P.'s evidence in the light most favorable to his case and assume credibility issues in his favor. Guilloty Perez, 339 F.3d at 50. We accept the parties' view that Maine law applies except so far as it might be displaced by a governing federal rule applicable to maritime matters. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 319-21 (1955); Greenly v. Mariner Mgmt. Group, Inc., 192 F.3d 22, 25-26 (1st Cir. 1999).

We begin with Frank P.'s contract theory, which, if successful, likely looks to liability of St. Paul rather than Charter Lakes; an agent who acts for a disclosed principal is not ordinarily party to the contract or liable for its breach by the principal. See County Forest Prods., Inc. v. Green Mountain Agency, Inc., 758 A.2d 59, 69 (Me. 2000). Here, Frank P. has not sought to recover on the policy as issued, regarding that avenue as blocked by the specific endorsement language excluding coverage beyond the 100-mile limit.

Instead, Frank P. argues in substance that the contract in force during his trip was a temporary "binder" contract that filled the gap until a formal policy later issued, and that the

-5-

formal policy misstated the coverage agreed to for the trip. This binder contract, in Frank P.'s view, was formed by the exchanges between the parties, including VanEpps' ultimate "good to go" assertion, and does not incorporate any 100-mile limit on the trip from Florida to Maine. According to Frank P.'s testimony, he told VanEpps that he was requesting trip insurance and VanEpps told him after receiving the completed application back that he was covered.

Frank P. testified that he told VanEpps that he planned to travel from Florida to Maine in a straight line (specifically, "as the crow flies"). During opening arguments, Frank P.'s counsel stated that such a route would have taken Frank P. outside of the 100-mile limit; although this statement itself was not evidence, United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997), cert. denied, 520 U.S. 1258 (1997), Frank P. later submitted into evidence a chart from which the jury could have determined that such a route would naturally have taken the GINA outside of a 100-mile limit between Cape Hatteras and Maine.

Frank P. further testified as to past practice in his dealings with Charter Lakes. He claimed that in the past, navigational limits for the APHRODITE had been cited in Charter Lakes' quote letter, and that the written binder issued thereafter had cited those same limits, which in turn were cited in the formally issued policy. Frank P. testified that during his

negotiations with VanEpps, no navigational limit was mentioned by VanEpps as to the trip from Florida to Maine.

In granting judgment for defendants as a matter of law, the district judge took the view that, under general law applicable to insurance, a temporary binder provides only that coverage that is common practice in the industry and that it was Frank P.'s obligation--as the claimant under a binder contract--to establish that such insurance could be procured from St. Paul or others without a 100-mile limit.  <u>Grande</u>, 365 F. Supp. 2d at 63-64. Admittedly, Frank P. offered no evidence on this issue one way or the other.

Case law does use common practice to fill in missing terms where, as is ordinarily the case, the binder arrangement is a temporary measure and contains little detail of its own.  "[W]hen a loss occurs after a binder has been issued, but before a policy is written, the insurer is bound to provide coverage in line with its standard policies referenced in the binder, or policies standard throughout the industry."  <u>Pine Ridge Realty, Inc.</u> v. <u>Mass. Bay Ins. Co.</u>, 752 A.2d 595, 599 (Me. 2000) (citations omitted); <u>see also</u> <u>Acadia Ins. Co.</u> v. <u>Allied Marine Transp. LLC</u>, 151 F. Supp. 2d 107, 125 (D. Me. 2001).  If Frank P.'s binder claim rested on a general request for insurance followed by a standard binder commitment by VanEpps, this would be a different case.

Here, however, Frank P. does not claim merely that he asked that insurance be switched from APHRODITE to GINA, which might easily be understood as importing the existing 100-mile limit contained in the APHRODITE policy or as compelling a search for common practice. Rather, he testified that he also asked VanEpps for coverage for the trip from Florida to Maine and that he told VanEpps that the GINA would follow the most direct course (which a reasonable jury might find--based on the chart submitted into evidence--would take her more than 100 miles offshore).

The "common practice" rule does not apply if a "special agreement" has been made in the course of contracting. Acadia Ins. Co. v. Allied Marine Transp. LLC, 151 F. Supp. 2d 107, 125 (D. Me. 2001) ("The general rule regarding the terms of an oral binder or contract for temporary insurance pending issuance of a written policy consists, in the absence of a special agreement, of the usual provisions of contracts employed to effect like insurance." (emphasis added)). Thus, when VanEpps said that insurance was in force, a jury could find (although not obliged to do so) that the parties were agreeing that the insurance was in force for the trip as described by Frank P. to VanEpps.

Defendants might say that the conversations were different or urge different inferences, but these would be typical jury issues. If the facts are resolved in Frank P.'s favor, we think that a contract--narrowed to an initial understanding that

coverage would include the trip unconstrained by a 100-mile limit--might reasonably be inferred by a jury. How matters would stand at the end of the defense case, if contrary evidence were offered, is not something we need to anticipate.

Two other objections were found by the district court to preclude recovery. The first was what the district judge described as Frank P.'s failure to offer proof of causation running from the alleged wrong to actual harm. The district judge said that Frank P. had failed to show that insurance providing the coverage sought by Frank P.--i.e., for a trip outside the 100-mile limit--would have been available either from St. Paul or anyone else. Grande, 365 F. Supp. 2d at 63-64.

There is some precedent, including one case from a Maine superior court, that is hostile to claims for a negligent failure to procure insurance, or even an alleged breach of a promise to procure insurance, where it turns out that the sought insurance was not in fact available.[2] This may make some sense where, as commonly appears to be so in these cases, there was no reliance on the broker's representation. This is about the best sense we can make of this case law when the facts of the cases are examined.

---

[2]See Royal Maccabees Life Ins. Co. v. Peterson, 139 F.3d 568, 570 (7th Cir. 1998); Huff v. Standard Life Ins. Co., 897 F.2d 1072, 1074 (11th Cir. 1990); Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc., 739 P.2d 239, 244 (Colo. 1987); Bangor-Brewer Bowling Lanes, Inc. v. Commercial Union-York Ins. Co., 2001 WL 1719238 (Me. Super. Ct. Pen. Cty., July 3, 2001).

Frank P.'s contract claim does not rest on a promise by the broker to seek to procure insurance--it is a claim that the broker, seemingly with apparent authority, provided insurance coverage for breach of which (one would expect) ordinary expectation damages are available. And, just to wrap matters up, even a negligence claim would on the present facts arguably rest on actual reliance (given Frank P.'s testimony that he would not have traveled outside of the 100-mile navigational limit had he known that such a limit attached). Thus, the causation objection is not enough to justify the directed verdict.

The district court's other objection was that Frank P.'s written application for the insurance was materially false because it represented him as the GINA's "registered owner" and did not disclose Frank A.'s interest anywhere on the application. 365 F. Supp. 2d at 64-67. The district court said that under Maine law, "[a]n insured must disclose in an application for insurance all known circumstances that materially affect the insurer's risks," id. at 65, adding that the doctrine is especially stringent under general maritime law where marine insurance policies are "traditionally contracts uberrimae fidei." Id. (quoting Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54 (1st Cir. 1995)). "Uberrimae fidei" roughly translates as "of the utmost good faith." Black's Law Dictionary 1558 (8th ed. 2004).

Regardless of whether the stricter maritime doctrine applies (as opposed to Maine law), we find that a jury issue is presented. In the application that Frank P. faxed to VanEpps, the entry for "registered owner(s) or [l]essee(s)" was answered with Frank P.'s name and address. It may be debatable whether Frank P. was the "owner"; on the one hand, his cousin, Frank A., paid for the vessel and the bill of sale was made out to Frank A. On the other hand, Frank P. testified that it was understood between the two cousins that Frank P. then became the owner of the boat, subject to an obligation to repay the purchase price in due course.

If Frank P.'s testimony is credited, then he might be regarded as "the owner" in the legal sense (given the intention of the cousins as to ownership) and in the economic sense (if, as appears to have been the case, Frank P. bore the risk of loss in the event that the boat sank uninsured). Again, the defendants could contest the facts and the inferences, but it is hard to see how a verdict on the contrary premise could be directed.

Admittedly, Frank P. was apparently not the "registered owner" when the application was submitted. This phrase refers to a filing with an official registry for vessels, such as is afforded by individual states or by the Coast Guard. Frank P. said that his plan was to register the vessel in his name when he got to Maine. It is unclear that any such filing was ever made in Frank A.'s name. Based on Frank P.'s testimony, a jury could reasonably find

him to be the "owner," but not the "registered owner," of the vessel at the time it sailed.

Absent a different regime imposed by statute, an insurance contract is ordinarily voidable if a false statement in the application was "material"--materiality meaning something that affects the risk and might lead either to a higher premium or a refusal of insurance. There are various formulations: one treatise says that in the marine insurance context, a material fact is "that which can possibly influence the mind of a prudent and intelligent insurer in determining whether it will accept the risk." 4A Appleman & Appleman, Insurance Law and Practice § 2651 (rev. ed. Supp. 2005).

Materiality, although largely a matter of applying a legal standard to particular facts, is one of those "mixed" questions that, like "negligence," is ordinarily left to the trier of fact unless the outcome is so clear that a reasonable jury could decide it only one way. "[C]ourts and commentators have long recognized that materiality is primarily a question of fact, the resolution of which is necessarily a function of context and circumstances." Dopp v. Pritzker, 38 F.3d 1239, 1244 (1st Cir. 1994), cert. denied, 514 U.S. 1108 (1995); see also Howard Fire Ins. Co. v. Chase, 72 U.S. 509, 515 (1866). Tradition and policy make this a reasonable assignment of functions.

-12-

Ownership of the insured property is normally a material fact in an insurance contract, see, e.g., Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d 412, 420 (9th Cir. 1998), cert. denied, 528 U.S. 815 (1999); among other things, the owner is the main party with an insurable interest, and the owner ordinarily has the primary incentive to safeguard the property (which reduces the risk). But if Frank P.'s testimony is accepted, he arguably was the owner in both senses. The district court seemed to think that Frank A. was the real owner, but given Frank P.'s testimony, this is a matter for the jury; indeed, it appears quite possible that Frank A. was not the owner when the insurance was sought.

It might still be "material" that the application inaccurately described Frank P. as the registered owner, but why is not so evident as to justify judgment as a matter of law. Neither the district court nor St. Paul's brief explains why registration is significant to the risk. There may well be a reason that St. Paul can adduce at trial. But, for now, it is an open question why the insurer would care whether Frank P., if the real owner, completed the registration before or after he arrived in Maine.

The district judge seemed to say that, in any event, it was material that Frank A. had purchased the boat in the first instance, transferred it orally, but had not yet been paid. It is not clear that any question in the application called for a disclosure of such facts; for example, if Frank P. had purchased

-13-

the vessel from the manufacturer with no money down and then registered it in his name, nothing in the application seemed to call for this to be disclosed. Under ordinary contract law, false statements can undermine contracts, but an affirmative duty to disclose is not universal. 1 Farnsworth on Contracts § 3.26c(3), at 409-10 (3d ed. 2004).

Nevertheless, under the strict maritime rule of uberrimae fidei, an insured must make "full disclosure of all material facts of which the insured has, or ought to have, knowledge . . . even though no inquiry be made." 7 Russ & Segalla, Couch on Insurance § 99:2 (3d ed. 1997) (footnote omitted); see also HIH Marine Servs. v. Fraser, 211 F.3d 1359, 1362 (11th Cir. 2000); Cigna, 159 F.3d at 420. This doctrine apparently rests on the special circumstances of maritime insurance in which the insurer may have less than ordinary opportunities to inspect and verify.

Yet even if the maritime rule applies--whether Maine law would apply the same approach anyway has not been briefed--judgment as a matter of law was not justified here. Frank A. testified that he never intended to possess or operate the vessel, and Frank P. said that he owned the vessel, owing Frank A. the purchase price. It is not clear why this arrangement would affect the insurer's risk assessment (although reasons might be adduced during the defendants' case at trial).

We therefore conclude that as to Frank P.'s contract claim against St. Paul, judgment as a matter of law should not have been granted. This brings us to the negligence and estoppel claims. Frank P. argues that such claims would survive even if the contract claim fell; the district judge treated both non-contract theories as more or less variations on the same theme as the contract claim, and, after disposing of the contract claim, found that the other two followed suit.

In principle, the contract, negligence, and estoppel claims are not identical as to elements or even parties. For example, while there is normally no liability of the agent for the principal's breach of contract, an agent may sometimes be liable in negligence to one with whom he deals, County Forest Prods., 758 A.2d at 69-70, while the principal may or may not be liable; and obviously whether one made and breached a contract or acted negligently in breach of a duty of care are two different questions.

Here, the district court ruled that the same considerations that it deemed to bar the contract claim--the disclosure flaws and lack of causation--also barred the alternative claims. Because we disagree with the premise as applied to the contract claim, no lengthy discussion of its extension to the other two claims is needed; they too must be remanded for further proceedings. However, we caution against too ready an assumption

that the answers or defenses that work against one claim necessarily work against all.

The judgment of the district court is <u>vacated</u> and the matter <u>remanded</u> for further proceedings consistent with this decision.  Costs are awarded to appellant on the appeal.

<u>It is so ordered</u>.